[S. F. No. 5246. In Bank.—August 4, 1911.]

In the Matter of the Estate of ADALINE A. F. RICKS, Deceased. THOMAS F. RICKS, Appellant, v. HIRAM L. RICKS, Respondent.

WILL—CONTEST—NONSUIT—ORDER GRANTING—REVIEW OF EVIDENCE ON APPEAL.—In reviewing, on appeal, an order granting a nonsuit on a contest of a will, in determining whether the evidence presented was sufficient to take the case from the jury, the entire evidence presented is to be viewed from a point most favorable to the contestant.

Disregard is had of any contradictory evidence. All facts support-
ing the case of contestant must be taken as true and all presump-
tions from the evidence and all reasonable inferences susceptible of
being drawn therefrom must be considered as facts proven in his
favor.

ID.—CONTEST OF WILL AND CODICIL—NONSUIT AS TO WILL—REVIEW OF
EVIDENCE.—Where a will and codicil executed at different dates are
contested on the ground of alleged undue influence and fraud, and
the evidence presented bore on the validity of both instruments, and
the court granted a nonsuit as to the contest of the will, in deter-
mining whether any case was made by the contestant showing undue
influence as to the execution of the will, or fraud practiced on the
testatrix in its execution, the evidence must be considered separately
and treated with reference to the different dates when the two in-
struments were executed.

ID.—UNDUE INFLUENCE INVALIDATING WILL.—The undue influence in-
validating a will must be such as destroys free agency, constraining
the testator at the time the will is made to make a disposition of his
estate contrary to and different from what he would have done if
he had been left to the free exercise of his own inclination or judg-
ment.

ID.—INFLUENCE MUST AFFECT TESTAMENTARY ACT.—Undue influence
which will affect a testamentary act must be such influence operating
upon the very act itself; an influence exerted and used prior to or
at the time of the making of the will and of which the will is the
product.

ID.—RELATION OF MOTHER AND SON—SON BUSINESS AGENT OF TESTA-
TRIX.—The mere fact that the relation of mother and son existed
between a testatrix and the beneficiary of her will, and that the son
was also her business agent at about the time the will was made, is
not sufficient of itself to warrant the jury in finding that undue
influence was exerted by the son in the making of the will.

ID.—CONFIDENTIAL RELATION NOT SUFFICIENT TO PROVE UNDUE INFLU-
ENCE.—Proof, merely, that confidential relations existed between a
testator and the main beneficiary under his will is not sufficient to
destroy its validity, but there must be some proof, in addition to
the relation, of facts or circumstances showing the use of that rela-
tion at the time the will was made overcoming the free will and
desires of the testator, in order to invalidate the testament.

ID.—DISCRIMINATION IN WILL BETWEEN SONS OF TESTATRIX.—The fact
that a testatrix leaves her estate to two of her sons to the exclusion
of a third, does not indicate that such disposition was the effect of
undue influence.

ID.—FRAUDULENT REPRESENTATIONS—EVIDENCE.—Fraudulent representa-
tions, in order to defeat a will, must have been made prior to or at
the time the will was executed. In the present case, it is held, after
a review of the evidence, that no such representations were shown, and

particularly, that there was no evidence that the son, who was the main beneficiary under the will, had falsely or fraudulently represented to the testatrix that an agreement had been made with the contestant, whereby he relinquished any right to share in her estate.

ID.—DECLARATIONS OF BENEFICIARY AGAINST CHANGING WILL.—Declarations made by the beneficiary, thirteen years after the execution of the will, evidencing his opposition to any change being made therein to the advantage of the contestant, are insufficient of themselves to show undue influence or false representations on the part of such beneficiary.

ID.—SUBSEQUENT DECLARATIONS OF TESTATOR TO PROVE UNDUE INFLUENCE OR FRAUD.—Declarations of a testator made subsequent to the execution of his will are not admissible as proof themselves of undue influence or fraud.

ID.—CONTEST OF WILL AND CODICIL—NONSUIT GRANTED AS TO ONE INSTRUMENT—JUDGMENT.—Where a will and a codicil are contested in a single petition, the proponent had a right to move for a nonsuit, both as to the will and codicil, or as to either, at the close of contestant's case, and if in the opinion of the court the evidence was insufficient to warrant submitting the question of the validity of either instrument to the jury it was the duty of the court to grant a nonsuit accordingly. Upon such nonsuit being granted, even if it applied to only one branch of the contest, the party in whose favor it is ordered is entitled to a judgment thereon.

APPEAL from a judgment of the Superior Court of Humboldt County entered upon an order granting a nonsuit in a contest of a will. G. W. Hunter, Judge.

The facts are stated in the opinion of the court.

Knight & Heggerty, and Selvage & Cutten, for Appellant.

L. F. Puter, Barclay Henley, and Mahan & Mahan, for Respondent.

LORIGAN, J.—The testatrix, by will dated December 16, 1890, devised and bequeathed her estate to two of her sons, the respondent Hiram L. Ricks and Casper S. Ricks, giving to her other son, the appellant here, a nominal legacy. Casper S. Ricks died August 7, 1896. On November 8, 1901, testatrix executed a codicil giving to said Hiram L. Ricks the portion of her estate bequeathed in her will to Casper S. Ricks. Testatrix died November 26, 1903, and on December 1, 1904, her will and the codicil thereto were admitted to probate. On

August 28, 1905, the appellant Thomas F. Ricks filed a contest of said will and codicil on the grounds of undue influence and fraud alleged to have been exerted and practiced on the testatrix by said Hiram L. Ricks.

The contest came on for trial before the court and a jury, and on September 26, 1907, contestant having rested his case, respondent moved for a nonsuit, both as to the contest of the will and codicil. The court granted the motion as to the contest of the will and denied it as to the contest of the codicil. On February 28, 1908, a judgment was entered on the order granting the nonsuit as to the will and from this judgment contestant appeals.

The evidence on the hearing of the contest of the will is brought here on a bill of exceptions and the main point urged for the reversal of the order granting the nonsuit is that there was sufficient evidence produced on the trial to call for the submission of the case on trial to the jury.

While the contest filed by the appellant was a single one and attacked the validity of both the will and the codicil and the evidence adduced on the hearing up to the time when contestant rested his case was directed to both instruments, we are concerned on this appeal with the evidence only which bore on alleged undue influence and fraud with respect to the execution of the will itself and which contestant claims made a sufficient case to go to the jury. It appears that after the order granting the nonsuit as to the will and denying it as to the codicil was made, the parties proceeded with the trial as to the validity of the codicil, which resulted in a disagreement of the jury. Thereafter another jury trial was had upon the codicil, resulting in a verdict against its validity, from which a separate appeal has been taken to this court by the present respondent, disposition of which will be made later.

In the petition of contest filed by appellant as the basis thereof he alleged that at the time her will was made and for a long time prior to the making thereof, and continuously thereafter till her death the respondent Hiram L. Ricks, was a partner in business with his mother and her confidential agent and business adviser and conducted her entire business to the exclusion of all other persons; that the mother knew nothing of the amount of property possessed by her or of the

business conducted in her name or in the name of the partnership, taking no part in the conduct thereof, but relying absolutely on said Hiram L. Ricks for information thereof, the latter conducting and controlling said business absolutely; that their mother had absolute confidence in the integrity, fair dealing, honesty, and capability of said Hiram L. Ricks, and because of said belief, entrusted the whole of her property and business to him; that long prior to executing said will said Hiram L. Ricks had the desire and intent to influence and induce their mother to make a will bequeathing the whole of her property to said Hiram L. Ricks and disinherit the petitioner, and that he took advantage of the confidential relation existing between his mother and himself to unduly influence her in the execution of her will.

It is then further alleged:

"That pursuant to the aforesaid design and intent, the said Hiram L. Ricks for the purpose of prejudicing the said Adaline A. F. Ricks against this petitioner, willfully and falsely represented to her, the said Adaline A. F. Ricks, deceased, and persuaded her to believe that your petitioner had received from her estate and her property in a division of his father's estate, all of the property he was to receive or which he might inherit from her or his brothers by reason of their death or otherwise, and that upon such partition he agreed to and with the said Hiram L. Ricks, Adaline A. F. Ricks and Casper S. Ricks, a brother now deceased, that he accepted and would take the amount of property so granted to him as a compromise in full of any and all rights which he might have or which might become his by reason of the death of his mother Adaline A. F. Ricks, or his brothers.

"That said representations were false and said respondent knew them to be false, and said Adaline A. F. Ricks, deceased, believed said representations to be true and acted upon the same, and because of said representations she signed and executed said documents purporting to be the will and codicil thereto, if the same were ever signed and executed by her, and she would not have so executed said will or said codicil thereto had she known that said representations so made as aforesaid were false and untrue."

The evidence introduced by contestant showed that prior to his death in 1888, the husband of testatrix and father of

the appellant and respondent and Casper S. Ricks, was the owner of a large amount of property in Eureka, Humboldt County, which a short time prior to his death he deeded to his wife and his three sons, who, until the division hereafter mentioned held it in common. After the death of her husband, testatrix took no part in the management of the business, leaving it to be conducted jointly by the respondent Hiram L. Ricks and the contestant, the latter principally conducting it. This joint conduct of the business continued practically until about December 16, 1890, at which date a division of the property held in common by the Ricks family was made. Some time prior to December 16, 1890, the harmony which had prevailed between the contestant and Hiram L. Ricks became disturbed, owing principally to the objection of contestant to certain expenditures and investments of money in the improvement of a public waterworks system in the city of Eureka, owned by the Ricks family. This inharmony became so acute that contestant demanded a partition of the property held in common by the family. His mother and his other brothers wished to keep the property intact in the family and seriously objected to any division. Contestant, however, insisted on it, with the result that his mother, who strongly objected until she saw that contestant would not recede from his demand, and as she declared, to keep peace in the family, finally consented to a partition, and on December 16th and 17th deeds were interchanged between the parties whereby the other members of the family conveyed certain property theretofore held in common to contestant, he conveying to them jointly his interest in the remainder. As far as the record shows, no partition was had between the other members of the family—Mrs. Ricks and Hiram L. and Casper S. Ricks—they continuing to hold their interests in the property in common.

After the segregation of the interest of contestant, the management of the remainder of the property which was still held by the other members of the family in common, was undertaken by Hiram L. Ricks. Casper S. Ricks had never given any attention to the business affairs, leaving that to contestant and respondent. And this assumption of the management of the business by the respondent after the division was not self-assumed nor against the wish or consent of his

mother nor by reason of any dominating influence over her. Mrs. Ricks was adverse to taking any part in the conduct of the business and as after the death of her husband the contestant and respondent had given it their attention, when the contestant drew out his interest, the respondent continued as he had theretofore done to manage it, and so continued to take exclusive charge of it up to the death of his mother. Casper L. Ricks being in failing health, on April 26, 1896, conveyed all his property to his mother for life, the remainder in fee to Hiram L. Ricks. On April 29, 1896, Mrs. Ricks executed a deed conveying all her property to Hiram L. Ricks, which deed she deposited with the cashier of a bank in Eureka accompanied by written instructions wherein she directed the said cashier to hold said deed and on her death to record it and deliver it to Hiram L. Ricks. This written letter of instructions contained the following statement of her purpose in making the conveyance to Hiram L. Ricks: "My reason for conveying to him (Hiram L. Ricks) all of my property described in such deed is because at the time my son T. F. Ricks withdrew his interest in the Ricks estate and deeds were made to him therefor by myself and my two sons, Casper S. and H. L., it was then understood and agreed that he was not to have any share in my property or estate and that the same was to go to my other sons as I might choose."

The attorney who prepared the deed in escrow, as a witness called for appellant, testified that he prepared it at the request and under instructions from Mrs. Ricks alone; that she wanted her reasons for making the deed to her son Hiram L. set forth in the escrow, stating to him that when the contestant withdrew his interest in the Ricks estate after she had tried to persuade him to hold their interests together, and deeds were made by herself and her sons Hiram and Casper to him, it was then understood and agreed that contestant was not to have any share in her property and estate; that contestant had said that she might leave her property to whomsoever she pleased, and that she was now going to do it. On October 12, 1903, Mrs. Ricks executed a deed to Hiram L. Ricks conveying all of her real property to him, which deed was recorded by said grantee on December 2, 1903, after the death of his mother. About the middle of August, 1903, the contestant being about to depart for San Francisco on a tem-

porary visit of some weeks, went to the home of his mother
to bid her good-bye. As to what occurred, he testified: "Well
as I started to go in the door I heard some loud talking. They
were eating breakfast, Lam (Hiram) and my mother, and as
I went in I said 'What is the matter here,' and mother said
we were just talking over what you said about what Matty
(the wife, since deceased, of Hiram L. Ricks) said that I was
going to disinherit you. She said Lam said at the time of the
division that you agreed not to take any more of my property,
and Lam said 'Yes he did.' I said I never did such a thing,
I said he lied, I never agreed to no such thing in the world.
I said I have not got a thing, all I got was father's quarter that
he gave me, and he has all the property, your property and
Cas's, the whole of it, and I have not got a thing from either
one of you. He denied it, and he and I had some words. We
were engaged in conversation I suppose about ten or fifteen
minutes. That is what I remember. Of course there was a
whole lot of talk and we both got pretty mad as we always
did whenever we got together. I then got up and bid mother
good-bye and kissed her good-bye and went off and got my
team. I think I was gone three weeks." It was further shown
that the day previous to her death one of contestant's sons—
Charles C. Ricks—called upon his grandmother, and a con-
versation was had between Mrs. Ricks, Hiram L. Ricks, and
himself. He testified that Hiram L. Ricks at the request of
his mother stated to him the agreement his father had made
at the time of the division—that he had agreed not to take
any more from the estate. At the request of Hiram he told
his grandmother of some disagreement he had had with his
father, whereupon she expressed her intention of giving him
(Charles) ten thousand dollars. Hiram suggested to his
mother that she give the ten thousand dollars to all the boys
— that is, eight thousand to Charles and one thousand each
to his two brothers. His grandmother asked Charles if this
would be satisfactory to him, and on his assuring her that
it was, she said: "I have not done right by Tom (contestant)
he should have more." Whereupon Hiram spoke up and said:
"You can give Charlie whatever you like, but you can't give
Tom a cent."

A witness, Mrs. M. J. Herrick, stated that within a month
before the death of Mrs. Ricks, she approached the residence

of the latter with the intention of calling on her. As she did so she heard Hiram L. Ricks say: "If you make any change in that property I will law away every dollar of it." This was all she heard said. She did not then go in the house; did not see any one there, and did not know to whom the statement of Hiram L. Ricks was addressed.

Appellant further testified that no agreement had been entered into between his mother and himself, as testified to by respondent, or between his mother and his brothers Hiram L. and Casper when the division of the property was made that he should not have any portion of whatever property his mother might leave.

Hiram L. Ricks, called as a witness by contestant, stated that at one of the conferences about the division of the property, and after contestant, over the strenuous protests and objections of the other members of the family, was insisting on a division, his mother said: "Tom (contestant) if you insist upon withdrawing your interest from the estate it must be final, you must draw all your interest, and what you expect to get out of the estate or out of the Ricks property," and "I don't know whether at that conversation or not, either at that one, or at some others, probably afterward, anyhow, Tom agreed to do what my mother said. 'You must select what you want as a final settlement so you boys will never be brought together in business again.' This is as near as I can tell the identical words. This conversation was between Tom, my mother, Cas and myself."

It was in evidence further that Mrs. Ricks, while adverse to business cares and responsibilities, was a woman of remarkable mental power. She read a great deal and was a woman of decided opinions, perfectly capable of knowing and understanding what she was doing with respect to any matter, and attended to her own household affairs and was never ill in her life until her last sickness, which lasted some forty-seven hours.

There was no allegation in the complaint of any want of mental capacity or the existence of any weakness of intellect which at the time when the will was made or subsequent thereto would render her susceptible to undue influence. On the contrary the evidence on the part of contetsant shows her possession of superior intellectual powers up to the time of her death. While the appellant and contestant subsequent

to the division of the property were not on friendly terms, the mother was at all times on affectionate terms with all her children.  After the division the visits and interviews between the respondent and his mother were, by reason of his management of the business, coupled with the fact that his business office was situated close to her residence, more frequent than those between his mother and contestant, although affectionate relations between his mother and contestant always existed.

Having set forth the evidence relied on, we address ourselves to the merits of the appeal.

The rule is well established that in contests of wills, as in other civil actions, in determining whether the evidence presented was sufficient to take the case from a jury, the entire evidence presented is to be viewed from a point most favorable to the contestant.  Disregard is had of any contradictory evidence.  All facts supporting the case of contestant must be taken as true and all presumptions from the evidence and all reasonable inferences susceptible of being drawn therefrom must be considered as facts proven in his favor.  (*Estate of Arnold,* 147 Cal. 583, [82 Pac. 252].)

But with this rule in view and applying it here, we are satisfied that the order of the trial court ganting the nonsuit was proper.  While the evidence presented bore both on the validity of the will and the codicil, in determining whether any case was made by the contestant showing undue influence as to the execution of the will, or fraud practiced on the testatrix in its execution, the evidence must be considered separately and treated with reference to the different dates when the two instruments were executed, as particular evidence which might be considered with reference to the execution of the will or the codicil might not be applicable to both, and whether it is applicable to either must be determined under a consideration of well-recognized rules of law.

The allegations in the petition of contestant are that the execution of the will of December 16, 1890, was procured through the undue influence of Hiram L. Ricks over his mother, and was likewise procured by fraud upon her in falsely representing that contestant had agreed at the time the division of property took place that he should receive no portion of her property at her death.

It is, of course, elementary, that undue influence invalidating a will must be such as destroys free agency constraining the testator at the time the will is made to make a disposition of his estate contrary to and different from what he would have done if he had been left to the free exercise of his own inclination or judgment. "Undue influence of that kind which will affect the provisions of a testament must be such as subjugates the mind of the testator to the will of the person operating upon it, and in order to establish it proof must be made of some fraud practiced, some threats or misrepresentations made, some undue flattery or some physical or moral coercion employed; so as to destroy the free agency of the testator." (Ency. of Law, vol. 29, p. 103.) And as said in *In re Kaufman,* 117 Cal. 288, 295, [59 Am. St. Rep. 179, 49 Pac. 192] : "The undue influence which will avoid a will must be such as operates upon the mind of the testator at the time of making the will, and must be an influence relating to the will itself." . . . And "Unless there was such evidence tending legitimately to prove that some fraud had been practiced upon the testatrix at that time, or that some misrepresentation had then been made, or that some physical or moral coercion had been employed, such as to destroy her free agency, the court erred in submitting to the jury the question whether undue influence had been exerted. It was inviting them to find as a fact that of which there was no evidence and which the law as well as reason presumed had no existence."

It must be borne in mind that when we speak of undue influence which will affect a testamentary act it must be such influence operating upon the very act itself; an influence exerted and used prior to or at the time of the making of the will and of which the will is the product.

With these rules in view we come to the points made by the appellant.

It is claimed, first, that at the time the will was made there existed the confidential relation between testatrix and respondent of mother and son, coupled with the fact that at that time he was also her confidential agent, the manager of her business, and acting for her exclusively in her business affairs; and it is argued that this situation warranted a deduction by the jury that respondent had taken advantage of such con-

fidential relations to procure from his mother the execution of her will as one of the main beneficiaries.

While counsel for appellant have cited various sections of the code, and general authorities on the subject of confidential relations, to the effect that testamentary disposition procured by an undue exertion of influence springing from such relation is invalid, they have not pointed out any conduct or acts on the part of respondent, or any circumstances attending the execution of the will, upon which they rely in support of their claim that the will was the result of undue influence exercised by respondent over his mother as far as confidential relations are concerned. They rely simply upon the proposition that because the relation of mother and son existed and her son was also her business agent at about the time the will was made, a confidential relation existed from the existence of which a jury would be warranted in finding that respondent had taken advantage of that relation and had unduly influenced his mother to execute her will in favor of himself and his brother Casper to the exclusion of contestant. But no warrant is given to a jury to find that undue influence was exerted at the time the will was made from proof merely of such relation alone. Undoubtedly the relation between respondent and his mother was affectionate and confidential and that he would have a general influence over his mother proceeding from such relation. But the existence of such relation and this general influence raises no presumption that undue advantage was taken of it by respondent. There is no legal suspicion of undue influence arising from the existence of such a relationship, which imposes upon the son the necessity, when a will in his favor is attacked, of assuming the burden of proof that he had not unduly influenced his mother in making the will. The confidential relation and the opportunity afforded therefrom to exercise undue influence, may, of course, always be taken into consideration with other evidence, when the question of undue influence is in issue. But the relation itself, and opportunity, are not sufficient alone to warrant a finding that undue influence was actually exerted. Proof, merely, that confidential relations existed between a testator and the main beneficiary under his will is not sufficient to destroy its validity, but there must be some proof, in addition to the relation, of facts or circumstances showing the use of that

relation at the time the will was made overcoming the free will and desire of the testator, in order to invalidate the testament.

As said in a case quoted from in *Estate of Nelson,* 132 Cal. 194, [64 Pac. 299] : "The presumption of undue influence is not raised by proof of interest and opportunity alone. In order to set aside a will for undue influence, there must be substantial proof of the pressure which overpowers the volition of the testator at the time the will was made. In order to establish that a will has been executed under undue influence, it is necessary to show not only that such undue influence has been exercised, but also that it has produced an effect upon the mind of the testator, by which the will which he executes is not the expression of his own desires. Substantial evidence must do more than raise suspicion. It must amount to proof and such evidence has the force of proof only when circumstances are proved which are inconsistent with the claim that the will was the spontaneous act of the alleged testator. In order to justify the submission of any question of fact to the jury, the proof must be sufficient to raise more than a mere conjecture or surmise that the fact is as alleged."

Now, a careful examination of the testimony in this contest fails to disclose any fact or circumstance showing that the respondent had anything to do with the making of the will of his mother in favor of himself and his brother Casper.

It is conceded that Mrs. Ricks was a woman of firm will and decisive mind; a woman of remarkable intellectual powers, and fully capable of understanding and knowing what she was doing at all times. No question is made about her mental capacity at the time the will was executed. There is not a pretense that she was then mentally infirm, and her will as far as its provisions are concerned, expresses clearly her intention as to the disposition of her property. There is nothing in the will itself which suggests any undue influence in making it. It is true that it leaves her estate to the respondent and his brother Casper to the exclusion of the contestant, but that does not indicate  that the favorable bequests to those two to the exclusion of the contestant was the effect of undue influence. She had a right to dispose of her property as she saw fit, and the motives which actuated her in doing so are

neither concern of jury nor court. When it appears that the testatrix had testamentary capacity, which in this case was conceded, the fact that she made a distinction between her children as to the share of her estate they should receive, is of no moment unless the preference was the result of undue influence or fraud, and no presumption of such undue influence or fraud arises from the fact merely that she made such preference. But aside from the fact that the testatrix in this case was at the time her will was made a woman of strong mentality, self-willed, and disposed to exercise her own judgment in all matters, and that this condition of mentality and character continued down to the time of her death; that she allowed her will to stand as she had written (except for the codicil) down to that time, there are further important facts and circumstances to be taken into consideration.

No evidence was introduced relative to the execution of the will; nothing as to who drew it, where it was executed, or the presence of any one in connection with its making; nor any testimony from the persons who were witnesses to it. In fact, the record is barren of any evidence on the subject. As far as the record discloses, the testatrix kept her own counsel and made her will secretly. She does not appear to have consulted any member of the family, or any one else, as to how she should dispose of her estate. In addition, there is not only an entire absence of the slightest proof of any agency on the part of respondent in procuring the execution of the will, but it affirmatively appears that he did not know that his mother contemplated making one, or that she had done so, until after its execution, when it was delivered to him by either his mother or his brother Casper.

In the absence, therefore, of any evidence tending to show that undue influence proceeding from their confidential relation had been exercised by respondent in procuring the making of his mother's will in favor of himself and his brother Casper, it was the duty of the court to refuse to submit that issue to the jury.

The further allegation in the petition of contestant was of fraudulent representations made by respondent to testatrix, which we have set forth above, and it is claimed that sufficient proof thereof was made to require the issue in that respect to be passed on by the jury.

The rule with reference to proof of fraudulent representations relied on to defeat a will is the same as governs the proof of undue influence claimed to have been employed. It must appear that such fraudulent representations were made prior to or at the time the will was executed. Contestant recognized the rule and alleged that undue influence was exercised and the fraudulent representations made prior to or at the time the will was executed.

But there was not a particle of proper or legitimate evidence introduced in the case showing that on or prior to December 16, 1890—the date of the will—any representations were made by respondent to the testatrix that an agreement had been entered into by contestant with his mother, or with her and respondent and his brother Casper, at the time the division of the property left by his father was made, whereby contestant relinquished all right to participate in any of the estate left by his mother at her death. As stated in discussing the claim of undue influence, there is not a particle of evidence that at any time the respondent spoke to his mother about making a will; or that he had any conversation with her, or made any statements or representations of any character to her respecting the disposal of her property, or of the existence of any agreement made by contestant. He was ignorant of the execution of any will until after it was made.

It is true that almost thirteen years after the will was made a bitter quarrel arose between contestant and respondent in the presence of their mother, and the statements which were then made are relied on by contestant in support of his claim of fraudulent representations. We have heretofore set forth in detail what then occurred.

But giving that conversation the greatest probative force, it falls far short of supporting the claim of contestant that it shows that prior to or at the time the will was made, respondent had represented to his mother that contestant had agreed to relinquish all right to any of her estate. It tends to show nothing of the kind. There was no mention in that conversation of the respondent having at any time, either before or after the making of the will, spoken to his mother about the existence of such an agreement. The matter then in dispute between the parties was not as to any statement being made at any time by respondent to his mother as to any agree-

ment having been made by contestant, but simply as to whether, when the division of the property was made, the contestant had, in fact, made such an agreement. Respondent insisted that he had, and contestant denied it. This is all that is disclosed in that conversation. No statement was then made by Mrs. Ricks that respondent had ever said anything to her about an agreement. In fact, from the testimony of contestant as to what occurred there, his mother took no part in the conversation. She said nothing one way or another on the subject, whether an agreement had been made or not, or whether any one had ever spoken to her on the subject. She only spoke of what Matty said that Lam (the familiar name of respondent) said that contestant at the time of the division had agreed not to take any of her property. This was all. Aside from this being purely heresay testimony on the subject of what Matty said respondent said, it did not even, as such, indicate that respondent had mentioned the agreement to his mother, but only that he had spoken of it to Matty.

Now, while under the evidence in the case there is a dispute as to whether such an agreement was made by contestant, the existence or non-existence of such an agreement was not the controlling point in the contest. It was an important one, but the validity of the will of testatrix under the issue as to fraud did not depend upon the solution of that question alone. The decisive question to be determined under the contestant's allegation of fraud was, did the respondent falsely and fraudulently represent to his mother that such an agreement was made, when in fact it had no existence? The jury might have found that there was no such agreement. It may be even assumed that the testatrix believed that there was, but that she was in error respecting the matter. But this would not warrant the jury under the issue of fraudulent representation, in declaring the will invalid. Under that issue it could only be so declared upon evidence which showed not only that no such agreement existed, but that the respondent had falsely represented and induced his mother to believe that it did, and that the will was the product of this belief thus fraudulently created and there is no evidence in the case which would support a verdict of the jury to that effect.

Our attention is directed to the declarations made by Hiram L. Ricks testified to by Mrs. Herrick and Charles C. Ricks.

CLX Cal.—30

These, at best, evidenced but opposition on the part of Hiram L. Ricks to any change in the will and codicil to the advantage of contestant. Aside from being declarations thirteen years after the making of the will, in the absence of any other evidence tending to show undue influence or false representations on the part of Hiram L. Ricks, they would be insufficient to establish it.

Certain declarations made by testatrix years after the execution of her will were admitted in evidence by the court during the trial. These declarations were offered by contestant avowedly for the purpose of proving undue influence and fraud, but these declarations in the absence of all other evidence are insufficient to sustain those issues.

Declarations of a testator made subsequent to the execution of a will are sometimes admissible when his mental capacity to make a will is involved. No question as to the mental capacity of Mrs. Ricks was involved here. They are admissible also to show the state of feelings of a testator towards and his relations with his children. When made cotemporaneously with the execution of his will, if made under such circumstances as to constitute a part of the *res gestæ*, the declarations of a testator are also admissible. But declarations made subsequent to the execution of a will are never admissible as proof themselves of undue influence or fraud. After the execution of his will a testator is no more permitted to impeach its validity by declarations respecting it than can the validity of any other instrument be impeached by subsequent declarations of the maker respecting it. (*Estate of Calkins,* 112 Cal. 296, [44 Pac. 577]; *In re Kaufman,* 117 Cal. 288, [59 Am. St. Rep. 179, 49 Pac. 192]; *Estate of Benton,* 131 Cal. 472, [63 Pac. 775]; *Estate of Gregory,* 133 Cal. 137, [65 Pac. 315]; *Estate of Donovan,* 140 Cal. 390, [73 Pac. 1081]; *Estate of Arnold,* 147 Cal. 593, [82 Pac. 252]; *Estate of Snowball,* 157 Cal. 301, [107 Pac. 598].)

The last point made by appellant is that the judgment appealed from entered upon the motion granting the nonsuit as to the contest of the will, should be reversed because it was prematurely entered. His position is, that, as both the validity of the will and of the codicil were contested in a single petition, upon which the parties went to trial, that while the court might grant a nonsuit as to the contest of the will and

deny it as to the contest of the codicil, or *vice versa*, still, in law, no judgment could be entered upon the order granting the nonsuit as to either, until the entire contest, both as to the will and codicil was finally determined. We do not think there is any merit in this point. Respondent had a right to move for a nonsuit, both as to the will and codicil, or as to either, at the close of contestant's case, and if in the opinion of the court the evidence was insufficient to warrant submitting the question of the validity of either instrument to the jury it was the duty of the court to grant a nonsuit accordingly. And upon such nonsuit being granted, even if it applied to only one branch of the contest, the party in whose favor it is ordered is entitled to a judgment thereon. (Code Civ. Proc., sec. 581.)

Our attention is not called to any authority which would render a judgment entered upon a motion for a nonsuit, as was done in this case, erroneous.

The judgment appealed from is affirmed.

Shaw, J., Angellotti, J., Henshaw, J., and Melvin, J., concurred.