[Civ. No. 1284.   First Appellate District.—December 4, 1913.]

In the Matter of the Estate of IDA OLIVE HODGDON, Deceased.  In the Matter of the Contest of the Will of said Decedent, by Samuel R. Crooks; SAMUEL R. CROOKS, Contestant and Appellant, v. HERBERT F. HODGDON, Individually and as Executor, etc., Respondent.

WILL—UNDUE INFLUENCE AS GROUND FOR REVOCATION OF PROBATE—SUFFICIENCY OF EVIDENCE.—In this proceeding for the revocation of the probate of a will on the ground of undue influence, the evidence presented by the contestant falls far short of measuring up to the degree of proof required to establish undue influence, or requisite to have warranted the lower court in submitting the issue to a jury; and for these reasons the motion of the respondent for a nonsuit was properly granted.

ID.—UNDUE INFLUENCE—EVIDENCE—WHETHER SUFFICIENT TO WARRANT COURT IN OVERTHROWING WILL.—Courts have neither the right nor the power to overthrow a will on the ground of undue influence, in the absence of direct and substantial proof bringing the case within those well established rules of law which define undue influence, and prescribe the extent to which the evidence in any given case must go in order to measure up to the requirements of such definition.

ID.—WHAT CONSTITUTES UNDUE INFLUENCE IN EXECUTION OF WILL.—Undue influence consists in the exercise of acts or conduct by which the mind of a testator is subjected to the will of the person operating upon it; some means taken or employed which have the effect of overcoming the free agency of the testator, and constraining him to make a disposition of his property contrary to and different from what he would have done had he been permitted to follow his own inclination or judgment.

ID.—TIME AT WHICH UNDUE INFLUENCE EXERCISED.—Courts must refuse to set aside a will upon the ground of undue influence, unless there is proof of a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made.

ID.—CONFIDENTIAL RELATION—HUSBAND AND WIFE—PRESUMPTION OF UNDUE INFLUENCE.—Where a wife makes a will in favor of her husband, no legal suspicion of undue influence arises from their confidential relations so as to impose on him the burden of proving that he has not unduly influenced her in making the will; but such relation and the opportunity afforded thereby may be taken into consideration with other evidence to prove undue influence on his part.

ID.—REVOCATION OF PROBATE OF WILL—MOTION FOR NONSUIT—CONSIDERATION OF EVIDENCE.—In considering the evidence before the court

on a motion for nonsuit in proceedings for the revocation of the probate of a will, the entire evidence presented is to be viewed from a point most favorable to the contestant, disregard is to be had of contradictory evidence, all facts supporting the case of the contestant must be taken as true, and all presumptions from the evidence and all reasonable inferences susceptible of being drawn therefrom must be considered as facts proved in his favor.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco and from an order refusing a new trial. Thomas F. Graham, Judge.

The facts are stated in the opinion of the court.

Wm. M. Cannon, and Paul C. Morf, for Appellant.

Charles W. Slack, and Walter H. Linforth, for Respondent.

RICHARDS, J.—This is an appeal from an order granting a nonsuit and denying the petition of the contestant and appellant for the revocation of the will of Ida Olive Hodgdon, deceased, and also from an order denying his motion for a new trial.

The petition of the contestant for revocation of the will in question was based upon several grounds, but the only one of these grounds of contest upon which evidence was presented at the trial, and the only ground urged upon this appeal why such will should have been revoked, and why the order granting a nonsuit and denying the petition of the contestant and appellant for its revocation and for a new trial, should be reversed, is the ground of undue influence, claimed to have been exerted by Herbert F. Hodgdon, the husband of said decedent and sole devisee under the terms of said will, in the procurement and execution of the same.

Upon the trial the court granted a motion for nonsuit at the close of the contestant's case; and upon these appeals this court is asked to determine the sufficiency of the contestant's evidence to entitle him to have the case go to a jury upon the sole issue upon which the evidence was presented as above set forth.

The following summary of the evidence, which must be necessarily much compressed in order to come within the

proper limits of an opinion, will serve to show the salient features of this case:

Ida Olive Crooks was the youngest child of Matthew and Susan Crooks; her father died in 1879; her mother died in 1894, when Ida Olive Crooks was just past 21 years of age. Shortly thereafter she married Herbert F. Hodgdon, who was about four years her senior, and who was then and for some time thereafter employed with the real estate firm of Madison & Burke, and who had no property outside of his earnings as an employee of said firm. Some years after her mother's death, Ida Olive Hodgdon came into the possession of an estate aggregating in value about two hundred thousand dollars, of which about sixty thousand dollars was in cash, and of which also there was certain personal property consisting of jewels, laces, rugs, bric-a-brac, and other household effects, including a number of family portraits which had come to her out of her mother's estate and which were of the appraised value of about eight thousand dollars. The rest of the property received from her parents was real estate. There were four other children of Matthew and Susan Crooks, brothers and sisters of Ida, all older than she, who also received their due and respective shares of real and personal property out of their parents' estates. The relation between Mrs. Hodgdon and these two brothers and sisters was always cordial and affectionate, and such also appears to have been in the main the relation between her husband and her brothers and sisters during practically all her married life. For a time after their marriage the young couple lived in a home in San Francisco which had been purchased by her prior to her mother's death, and furnished by her mother, but finally paid for out of her share of her mother's estate. Later Mr. Hodgdon gave up his position with Madison & Burke, and went with his wife to Colorado Springs, where she went for her health, which was always delicate; and from thence to New York and then to Los Angeles; and from thence to a desert resort for those threatened with tuberculosis; and finally to Redlands, where they lived for some time and up to the early part of the year 1902. The marriage between Mr. and Mrs. Hodgdon had been a love match, but this fact did not operate to prevent occasional, and sometimes very bitter quarrels between them, due partly to the fact that Mr. Hodg-

23 Cal. App.—27

don's habits were at times such as to give his wife much offense and pain, and partly also because of the nervous spells of Mrs. Hodgdon due to the delicate condition of her health. While they were living at Redlands a discord arose between them which led to a temporary separation, Mr. Hodgdon leaving his wife there and coming to San Francisco, where he resumed his position with his former employers. Mrs. Hodgdon shortly followed him, and they became reconciled, going to live at the Hotel Granada in San Francisco. Here also there were occasional discords between the pair, during which on two different occasions the wife left her husband in much anger, and went to the homes of her sisters, through whose good offices on each occasion, however, harmony was restored.

While they were living in Redlands, Mrs. Hodgdon made a will, leaving her husband all her property with the exception of the jewels, laces, rugs, and bric-a-brac which she had received from her mother, and which she bequeathed to her sisters. Shortly after arriving in San Francisco in the early part of 1902, Mrs. Hodgdon visited the office of Joseph C. Campbell, Esq., and there executed another will substantially in the terms of the former one. Neither of these wills was produced in court; but it would seem that in each of them Mrs. Hodgdon had bequeathed to her husband all of her estate except the foregoing items of personal property, valued at eight thousand dollars, either for life or in fee. During the several months which succeeded the making of this (the Campbell) will Mrs. Hodgdon's health was very poor; her nervous state was at times quite serious, and this condition was accentuated both by her quarrels with her husband and by the consciousness that a serious operation was impending. Such operation was in fact performed about September 1, 1902. After the operation Mrs. Hodgdon's health for a time improved, and she lived until November, 1906, when she died quite suddenly at the age of thirty-two years. The will in question bears date August 29, 1902. It is a holographic will written by the testatrix in evident accordance with a form furnished by a lawyer. It is also subscribed by two witnesses, neither of whom was called to testify as to the circumstances under which it was made; in fact, no evidence whatever was presented showing the immediate circumstances

attending the making of the will except possibly the negative
proof that Mr. Hodgdon was not present at the time of its
execution. The undisputed evidence shows that Mrs. Hodg-
don was a woman of bright mind, good education, and a strong
will; in fact, the proof makes it quite clear that she was self-
willed and independent beyond the average of wives, partic-
ularly in the management and control of her property in-
terests and affairs. She kept her own accounts, made her own
investments, and handled her own funds in her own name.
She consulted with her husband frequently regarding the buy-
ing and selling of her property; but in the actual transactions
employed her own agents and lawyers and acted in conformity
with her own judgment. While the relation between her
husband and herself with respect to her properties was in-
timate and confidential, it nowhere appears by any affirmative
proof that the husband at any time made any undue use of
this relation to secure an advantage to himself against either
her interest or desire; nor is there to be found in the record
any proof that in the making of her final will her husband
had any part, or exercised any undue or other influence what-
ever. The relation between Mr. Hodgdon and the two sisters
of his wife, who were the chief beneficiaries other than him-
self under the terms of her former wills, was in the main
friendly to the point of cordiality; and the elder of these,
Mrs. Morffrew, on more than one occasion during the occur-
rence of quarrels between Mr. and Mrs. Hodgdon was rather
inclined to take the side of the former and to hold her sister
to be in the wrong. There is an entire absence of evidence
showing either an attempt or desire on the part of Mr. Hodg-
don to interfere with or in anywise discourage the cordial and
affectionate relation which at all times, both before and after
this will was made, existed between his wife and the members
of her own family. During the more than four years which
intervened between the date of the will in question and the
date of Mrs. Hodgdon's death, the undisputed evidence shows
that she had every opportunity to change the terms of her
said will if she so desired; and while it appears that during
that time she spoke frequently of making other wills or of
otherwise disposing of her estate, there is no pretense of a
showing that she ever carried into effect such a design, or
that she was ever in any way prevented from doing so by

the influence of her husband over her mind or intent. The quarrels which Mrs. Hodgdon had with her husband during their married life were only occasional and of temporary duration; and during the intervals between them the relations between husband and wife were affectionate and confidential. She loved her husband to the end; and since they were childless, and since her brothers and sisters were amply provided for in their own respective shares of their parents' properties, it was nothing more than natural that she should leave to her husband whom she loved her entire estate.

The only property really involved in this contest is the jewels, laces, rugs, pictures and bric-a-brac, valued at about eight thousand dollars, which Mrs. Hodgdon had received from her mother with the desire on the latter's part that they should go to her elder daughters in the event of Mrs. Hodgdon's death. It would seem that this had been at times the resolution of the latter, and it is not made clear why this laudable intent was not carried into effect in her final will; but it was not; and there is an utter lack of evidence that any act or influence on the part of her husband operated to divert her mind from that intent.

Courts have neither the right nor power to reframe the wills of decedents, nor to change or overthrow their formally expressed intent as contained therein, in the absence of direct and substantial proof bringing the case within those well-established rules of law which define undue influence, and prescribe the extent to which the evidence in any given case, when viewed from its most favorable aspect to the contestant, must go in order to measure up to the requirements of such definition so as to entitle the case to be submitted to a jury.

In the recent case of *Estate of Ricks*, 160 Cal. 467, [117 Pac. 539], the supreme court defined undue influence to consist "in the exercise of acts or conduct by which the mind of the testator is subjected to the will of the person operating upon it; some means taken or employed which have the effect of overcoming the free agency of the testator, and constraining him to make a disposition of his property contrary to and different from what he would have done had he been permitted to follow his own inclination or judgment"; and in the case of *Estate of Gleason*, 164 Cal. 756, [130 Pac. 872], the same court, in declaring the extent to which the evidence

of a contestant is required to go in order to measure up to this definition, says: "The unbroken rule in this state is that the courts must refuse to set aside the solemnly executed will of a deceased person upon the ground of undue influence unless there be proof of a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made" (citing *Estate of Carithers,* 156 Cal. 422, 428, [105 Pac. 127] ; *Estate of Lavinburg,* 161 Cal. 536, 543, [119 Pac. 915] ; *Estate of Kilborn,* 162 Cal. 4, [120 Pac. 762].)

When confidential relations exist between the testator and the beneficiary, involving the elements of mutual affection and obligation such as exist between husband and wife, or parent and child, it has been recently and properly held that "There is no legal suspicion of undue influence arising from the existence of such relationship, which imposes upon the son the necessity, when a will in his favor is being attacked, of assuming the burden of proof that he had not unduly influenced his mother in making the will. The confidential relation and the opportunity afforded thereby to exercise undue influence may, of course, always be taken into consideration with other evidence when the question of undue influence is in issue; but the relation itself and the opportunity are not sufficient alone to warrant a finding that undue influence was actually exerted; but there must be some proof, in addition to the relation, of facts and circumstances showing the use of that relation at the time the will was made, overcoming the free will and desire of the testator, in order to invalidate the testament. (*Estate of Ricks,* 160 Cal. 450, 461, [117 Pac. 532] ; *Estate of Nelson,* 132 Cal. 182, [64 Pac. 294] ; *Estate of Langford,* 108 Cal. 608, [41 Pac. 701] ; *Estate of Calkins,* 112 Cal. 296, [44 Pac. 577] ; *Estate of McDevitt,* 95 Cal. 17, [30 Pac. 101].)

The foregoing statement of the well settled law of this state defining undue influence, and prescribing the measure and extent of its proof required in the contest of wills to justify the submission of the case to a jury, will suffice to set the standard by which the evidence in this case must be measured and weighed in passing upon these appeals.

The rule is also well established that, in considering the evidence which was before the court at the time a motion for

nonsuit was made and granted, the entire evidence presented is to be viewed from a point most favorable to the contestant; disregard is to be had of contradictory evidence; all facts supporting the case of the contestant must be taken as true, and all presumptions from the evidence and all reasonable inferences susceptible of being drawn therefrom must be considered as facts proven in his favor. (*Estate of Ricks,* 160 Cal. 450, [117 Pac. 532] ; *Estate of Arnold,* 147 Cal. 583, [82 Pac. 252].)

Bearing in mind the foregoing principles and rules of law defining undue influence, and prescribing the requisites of its proof in order to justify the submission to a jury of the issue as to the validity of the will; and approaching the evidence in this case in the spirit of the rule last above quoted, we have carefully examined the evidence herein, not only as contained in the voluminous transcript, but also from the various angles at which the salient features of such evidence have been presented in the able and elaborate briefs and arguments of respective counsel, and we deem it sufficient to say that the evidence presented by the contestant falls far short of measuring up to the degree of proof required to establish undue influence, or requisite to have warranted the lower court in submitting the issue to a jury; and that for these reasons the motion of the respondent for a nonsuit was properly granted.

We also perceive no sufficient error in the ruling of the court sustaining the objection of the respondent to certain questions respecting the mental attitude of the decedent toward one of the subscribing witnesses to her will, to justify a reversal; and as to the refusal of the court to require the production and exhibition to the jury of certain personal effects of the decedent, we think its ruling in that regard was a proper exercise of discretion.

The judgment and order denying contestant's motion for a new trial are affirmed.

Lennon, P. J., and Kerrigan, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on January 30, 1914.