[S. F. No. 5665. Department Two.—December 13, 1911.]

In the Matter of the Estate of SAMUEL LEWIS LAVIN-BURG, Deceased. LEON ELEAZAR LAVINBURG, Contestant of Will, Respondent, v. SARAH SCHWAL-BE, Individually and as Executrix, and JESSIE BLOOM, Legatee, Appellants.

WILL—CONTEST FOR UNDUE INFLUENCE—CIRCUMSTANTIAL EVIDENCE—DEGREE OF PROOF REQUIRED — PRESUMPTION — VERDICT NOT SUP-PORTED.—Upon the contest of a will for undue influence, evidence must show that pressure was brought to bear upon the testamentary act. Though that pressure may be shown by circumstantial evidence, it must do more than raise mere suspicion; but must amount to proof of circumstances inconsistent with the claim that the will was the spontaneous act of the alleged testator. Where no adverse circumstances appear which extend beyond suspicion, and they are not inconsistent with other circumstances showing that the will was the voluntary act of the testator taken under the independent advice of an attorney, the presumption is, in the absence of inconsistent proof, in favor of the will, and the circumstances shown do not justify a verdict against its validity.

ID.—CONFIDENTIAL RELATION BETWEEN TESTATOR AND CONTESTEE—PRE-SUMPTION—PROOF REQUIRED.—The mere existence of a confidential relation between the testator and his daughter, who is the contestee, is not enough, when taken alone, to raise the presumption of undue influence on her part upon the testator; but there must be some proof, in addition to such relation, of facts and circumstances show-ing the use of that relation, at the time the will was made, over-coming the free will and desire of the testator, in order to invalidate the will as to the daughter.

ID.—NOMINAL TRUST RELATION — CONTROL BY TESTATOR OVER PROP-ERTY—INDEPENDENT ACTION AS TO WILL.—It is held that the trust

relation between the testator and his daughter was more nominal than real; that he always had control of his property, and that the trust relation amounted to nothing, in view of the fact that the testator had independent advice, and acted in the absence of his trustee in the preparation of his will, and that any presumption that could arise from the trust relation was fully met and overthrown by the uncontradicted evidence showing the actual circumstances surrounding the preparation and execution of the will.

ID.—EVIDENCE—INADMISSIBLE DECLARATIONS OF CONTESTEE AS LEGATEE —HEARSAY—WILL NOT TO BE INVALIDATED AS TO ONE LEGATEE.— Declarations of the contestee as one legatee, made without the presence of the other legatees, are hearsay and not binding upon them; nor can a will be invalidated as against one legatee and upheld with respect to the other legatees.

ID.—DECLARATIONS OF TESTATOR AS TO FRIENDLINESS TO SON—ADMISSIBILITY—ABSENCE OF INSTRUCTION LIMITING EVIDENCE—ERROR.— Declarations of the testator, made both before and after the execution of the will, tending to show his affection for his son, who was the contestant of the will as against a daughter to whom he had made a much larger bequest, were admissible, if limited by suitable instructions to their functions as showing friendliness to the son; and it was error to fail to so limit their application.

ID.—DOMESTIC TROUBLES OF TESTATOR—COMPETENT EVIDENCE FOR CONTESTANT.—It is held that evidence as to domestic troubles, and un happy married life of the testator with his second wife, was com petent evidence, in view of an offer of the contestant to show that the daughter, as contestee, took advantage of her father's distress, in bringing about the execution of his will in her favor, to the detriment of the contestant.

ID.—EVIDENCE OF FORMER WIFE OF TESTATOR—MENTAL CONDITION AT TIME OF WILL—IMPROPER CROSS-EXAMINATION.—Where the former wife of the testator testified as to the mental condition of the testator about the time the will was executed, the court properly sustained an objection on cross-examination to her opinion as to whether or not the testator was easily influenced.

ID.—EVIDENCE—BELIEF OF TESTATOR THAT SON WAS WEALTHY—REBUTTAL.—Where the contestees offered evidence to show that the testator believed his son, the contestant, to be wealthy, he was entitled to state in rebuttal that he had never stated to the testator that he was wealthy, but was not entitled to show in rebuttal that he was in fact poor, the only issue being as to the testator's belief as to his wealth.

APPEAL from an order of the Superior Court of the City and County of San Francisco denying motions to vacate the verdict of a jury sustaining the contest of a will. Thomas F. Graham, Judge.

The facts are stated in the opinion of the court.

Heller, Powers & Ehrman, and Marcel E. Cerf, for Sarah Schwalbe, Individually, and as Executrix, Appellant.

J. E. Harper, and John R. Tyrrell, for Jessie Bloom, Appellant.

J. J. Dunne, and H. H. Davis, for Respondent.

THE COURT.—Jessie Bloom and Sarah Schwalbe, two of the legatees under the will of Samuel L. Lavinburg, deceased, appeal from the orders denying their motions to vacate the verdict of the jury rendered in favor of Leon E. Lavinburg in a contest of said will. Contestant is a brother of appellants and also a legatee under his father's will.

By the terms of the will of Samuel L. Lavinburg legacies were provided as follows: To the son Leon L., the contestant, five hundred dollars; to Cecilia Werthman, a daughter, five hundred dollars; to Jane Ruben, a daughter, five thousand dollars; and the residue in equal parts to Sarah Schwalbe and Jessie Bloom, daughters. Sarah Schwalbe and California Safe Deposit & Trust Company were nominated as executrix and executor, respectively, but the latter failing to qualify Mrs. Schwalbe was appointed and letters testamentary issued.

The contestant did not depend upon any direct showing that the testamentary act of Samuel L. Lavinburg was influenced by Sarah Schwalbe, but according to the theory of the contest all of the facts and circumstances surrounding the acts of the testator in making his will, led to the inevitable conclusion that it must have been, not the spontaneous act of Lavinburg, but the product of his daughter Sarah's malign influence over him. The essential facts as shown at the trial were as follows: Lavinburg was formerly a resident of England, living first at London and afterward at Brighton. While residing in the latter city in 1884 he became involved in financial troubles and wrote a letter to his son who had gone to Canada to live, asking the latter (the contestant here) to return to Brighton and to assist in the settling of the father's affairs. In response to this letter Leon returned to Brighton, contributed between four and five hundred dollars to the father's account, helped

the latter to the settlement of his affairs, and in 1885 accompanied the family to San Francisco, where his father and mother remained, but where he stayed only a short time, returning to the middle west, and settling finally in Chicago, where he resided until 1906, when he returned to San Francisco. Here he has resided ever since. It was shown at the trial that a very warm affection existed between the father and his only son. On the latter's return from Canada to Brighton the father kissed him and exclaimed "Oh, Leon, Leon, you have saved me by coming home." The letters of the father to the son, while not frequent, were of most affectionate tenor. When Leon returned to San Francisco in October, 1906, he was met at the station by his sister Mrs. Schwalbe, who conducted him to the home of Mrs. Bloom, another sister, where his father then resided. Again he was received by his father with many demonstrations of love and during the next few days he and his father were together almost constantly. Without going into the testimony in detail it is sufficient to say that it indicated great affection upon the part of testator for his son.

After the family arrived in San Francisco the daughters married. One of them, Mrs. Jessie Bloom, resided for some years in Seattle, but later returned to San Francisco. Lavinburg's wife died in 1892, and soon afterwards he went to live with his daughter Mrs. Cecilia Werthman, but owing to some quarrel he sought other quarters. In 1904 there was another disagreement between Mr. Lavinburg and the Werthmans, which apparently was never settled prior to his death at Christmas, 1907. Meanwhile his will was executed on January 5, 1905.

There was abundant evidence of testator's love for his daughter Mrs. Sarah Schwalbe, who was found by the jury's verdict to be guilty of influencing him unduly in the making of his will. Dr. Levy, who had been his pastor and friend for twenty years, testified: "He was a man of very strong will power and determination. He told me he would dispose of his property in his own way, and that Mrs. Schwalbe had been more kind to him than the rest of the members of his family." Mr. D. R. Wilson, a member of the San Francisco Stock and Bond Exchange, who knew Lavinburg very intimately, gave the following testimony regarding testator's affection for his

daughter, Sarah Schwalbe: "He said that he had the utmost confidence in Mrs. Schwalbe, that she had always treated him with filial respect; that he had a great deal of regard and trust in her." Similar testimony was given by Dr. Mann, Mr. Thomas Craig, Mr. Robert F. Parsons and Miss Celia Caro.

In 1898 Lavinburg married. This union proved to be a very unhappy one and in 1904 his wife instituted divorce proceedings on the ground of extreme cruelty. The usual order for costs and counsel fees *pendente lite* was made and an order was issued to him and to the bank which held custody of his property restraining them from disposing of any of it. Lavinburg, who was unquestionably most averse to parting with any of his money, was greatly disturbed by the prospect of having to support his wife after a divorce. A settlement was finally reached and Mrs. Lavinburg went back to live with her husband on December 20, 1904. By the terms of the agreement with his wife, Lavinburg placed six thousand dollars worth of bonds in trust with California Safe Deposit and Trust Company to provide an income of twenty-five dollars a month for her. She remained with him but a short time after the reconciliation, however. She testified that on the morning of January 2, 1905, her husband called her names and quarreled with her without occasion. Afterwards she went out to do some shopping and on her return Mr. Lavinburg and Mrs. Schwalbe were talking together in the dining room. She overheard the latter say: "I can't stand that any longer. You have to go and see a lawyer and make an end of that." Thereupon, Mrs. Lavinburg left the house and never again lived with her husband, although in 1906 Mrs. Schwalbe urged her to return saying: "You know I can make father do better for you if you want to go back."

On January 3, 1905, the day after his wife's departure, Lavinburg and his daughter Sarah Schwalbe, who had remained at his house during the previous night, went to the San Francisco Savings Union where Mr. Lavinburg conferred with Mr. Robert M. Welch, the cashier of that bank. He told Mr. Welch that he had married a young woman, that divorce proceedings were pending, and that he had made a settlement with his wife but feared further attacks by her upon his fortune as she knew he was worth about fifty thousand dollars. He desired to part with his title to certain stocks and bonds

deposited with the bank to secure an indebtedness. Finally upon the suggestion of Mr. Welch, Lavinburg made a bill of sale to Mrs. Schwalbe of more than fifty thousand dollars worth of securities and she became substituted as the bank's debtor in her father's place for approximately thirty thousand dollars. She also placed three certain orders with the bank directing that the securities were to be released to her father as payment of their market value might be made by him; that on payment of the balance due on her note the securities were to be delivered to him; and that he was to collect all dividends on the pledged stocks and bonds. The trust relation thus created was greatly relied on as tending to establish contestant's case and we shall have more to say of it later. After the transaction at the bank on January 3, 1905, according to the testimony of Mrs. Schwalbe, she said to her father that he had placed a great responsibility upon her and that he would better make some paper to show what he would wish her to do in case of his death. He replied: "Well, after a while I will make a will," and they parted. She also testified that two weeks later he told her that she and the California Safe Deposit and Trust Company were the "executors" of his will, but that he never revealed its contents to her until after the great fire of April, 1906. After leaving Mrs. Lavinburg on January 3, 1905, and probably on the same day, Mr. Lavinburg went alone to the California Safe Deposit and Trust Company's place of business and was referred to Mr. Cerf as a lawyer who would properly draft a will for him. He went alone to Mr. Cerf's office. Mr. Cerf was engaged upon some important work and suggested that while Lavinburg was waiting for him to complete the task at hand the time might be profitably employed in drawing a memorandum of the matters which he wished to incorporate in his will. This was done and the memorandum in Lavinburg's handwriting, which was introduced in evidence, contained practically the provisions which were afterwards incorporated in the will. After considerable discussion at Mr. Cerf's office Mr. Lavinburg departed. Two days later he returned alone and executed the will, Mr. Cerf and Mr. Norris acting as witnesses, and the document, at Mr. Lavinburg's special request, remained in Mr. Cerf's custody until the testator's death. Mrs. Schwalbe never saw it until after that event. There was not only the testimony of the witnesses to the will

that on January 5, 1905, Lavinburg was of sound and dispos-
ing mind, but a number of intimate friends testified that he
was a man of iron resolution with reference to his own affairs
who was not easily influenced by any one.

Contestant introduced evidence to the effect that Mrs.
Schwalbe had a general influence over her father and was
wont to boast of it. His contention seems to be that the will
was unnatural; that Mrs. Schwalbe had a great influence over
her father; that at a time when he was greatly perturbed
over his marital difficulties she suggested that he make a will;
that at the time she made such suggestion she was his trustee,
holding his possessions, as counsel for contestant phrase it,
"in the hollow of her hand;" that this trust relation, coupled
with other facts and circumstances, created a presumption of
undue influence; that she accompanied her father to the bank
on January 3, 1905, after the opportunity of influencing him
accorded by her remaining at his home during the preceding
night; and that her influence remained with him and over-
powered his volition during the subsequent period of prepara-
tion and execution of his last will.

We think that the circumstances shown do not justify the
conclusion reached by the jury. The verdict must have been
influenced by the idea in the minds of the jurors that the will
was unnatural and by certain matters erroneously admitted
in evidence which we shall discuss later. Testator was a man
who, though of an age somewhere between seventy-four and
eighty years, was abundantly able to conduct his affairs and
who did manage them with ability and thrift. There was
some conflict of evidence regarding his bodily vigor at the
time the will was executed, but there is no contention that he
was not mentally competent. This man of business went alone
to the office of an attorney; without suggestion or assistance
drew the memorandum of his wishes respecting the disposi-
tion of his property by will; returned according to appoint-
ment; and executed that instrument. For almost three years
thereafter he mingled with his friends; attended to his affairs;
met and associated with his son who returned after an absence
of twenty years; and yet he made no complaint of his daugh-
ter's dominion over him nor any effort to free himself from
that malign charm. It requires better evidence than this
record presents to set aside an act done apparently with

deliberation and executed with the solemn formality required by law. To the facts shown by the record before us this language from the opinion in *In re McDevitt*, 95 Cal. 33, [30 Pac. 106], seems thoroughly applicable: "Evidence must be produced that pressure was brought to bear directly upon the testamentary act; but this evidence itself need not be direct. Circumstantial evidence is sufficient. It must, however, do more than raise a suspicion. It must amount to proof, and such evidence has the force of proof only when circumstances are proven which are inconsistent with the claim that the will was the spontaneous act of the alleged testator. I think there is nothing beyond suspicion shown here. There is no proof. Circumstances have been proven which accord with the theory of undue influence, none of which are inconsistent with the hypothesis that the will was the free act of an intelligent mind. This does not amount to proof. And many circumstances are shown which are wholly inconsistent with the hypothesis of undue influence. And the presumption of law, in the absence of all proof, in a contest is in favor of the will." (See, also, *In re Langford*, 108 Cal. 622, [41 Pac. 701]; *Estate of Kendrick*, 130 Cal. 368, [62 Pac. 605]; *Estate of Nelson*, 132 Cal. 194, [64 Pac. 294]; *Estate of Carithers*, 156 Cal. 428, [105 Pac. 127].)

Assuming that the will was an unnatural one which cut off the son and one daughter from that share of the property which they were entitled to expect, that alone cannot avail to sustain the verdict finding undue influence; and in this connection it is well to remember that the testator was not upon good terms with Mrs. Werthman when the will was drawn.

It is insisted by respondent's counsel that under the circumstances of this case undue influence is presumed from the confidential relations existing between Mrs. Schwalbe and her father. The court properly instructed the jury that the existence of a confidential relation between the testator and this beneficiary was not enough, taken alone, to raise a presumption of undue influence. While there was such a relation existing between Mrs. Schwalbe and her father, it was more nominal than real, because, as we have seen, Mr. Lavinburg up to the time of his death held complete control over his property. But giving to the circumstances of the trust rela-

tion all possible weight, it amounts to nothing in view of the
fact that the testator had the independent advice of an at-
torney and acted in the absence of his trustee in the prepara-
tion and signing of his will. This is not a case where ad-
vantage was taken of a sick man to whom others had no
access, by one standing with reference to him in a relation of
confidence and trust. It is rather the case of a shrewd, stub-
born business man who acted after obtaining professional
legal advice. This case is similar in several essential par-
ticulars to *Estate of Higgins,* 156 Cal. 259, [104 Pac. 8]. That
was a case in which the testator was an aged, feeble man and
the proponent a favorite son who stood in a confidential
relation to him. This son had urged the father to make a will.
After referring to the presumption arising from the existence
of confidential relations, Mr. Justice Sloss, speaking for the
court, said: "This presumption was fully met and overthrown
by the uncontradicted evidence showing the actual circum-
stances surrounding the preparation and execution of the
will. (*Estate of Morey,* 147 Cal. 495, [82 Pac. 57].) It was
shown that the testator, before executing his will, had con-
sulted with an attorney, who visited him for that purpose. At
this interview no member of his family, except his wife, was
present. The nature and extent of a surviving wife's interest
in community property was explained to the testator, who
said that one half of the estate (all of which he declared to be
community property) would be sufficient provision for Mrs.
Higgins. Concerning the disposition of the other half, he
said he did not desire to give his daughter an equal share.
He first spoke of giving her fifteen hundred dollars, but be-
fore the close of the interview mentioned the sum of twenty-
five hundred dollars. He stated that he did not want Mr.
Chick, his daughter's husband, to handle any considerable
amount of his property. In the afternoon of the same day,
the attorney, accompanied by his son, returned with a draft
for the proposed will. In the absence of the proponent the
testator was asked for his decision regarding the gift to his
daughter. He expressed a thought of raising it to thirty-five
hundred dollars. The attorney then suggested a division into
shares instead of a cash legacy. This, after some consideration,
was approved by the testator, and he fixed upon the propor-
tions of one sixth to Mrs. Chick, two sixths to Albert and three

sixths to Herbert. Blanks which had been left in the draft
were filled accordingly and the will was executed. Its other
provisions, such as appointment of executor, etc., followed
the direction of the testator. In the face of this showing,
which we have set forth in mere outline, there is no basis
for the claim that the will was secured to be made by the
undue influence of proponent." In the later case, *In re Ricks,*
160 Cal. 456, 467, [117 Pac. 536, 539], the rule is thus stated
by Mr. Justice Lorigan: "But no warrant is given to a jury
to find that undue influence was exerted at the time the will
was made from proof merely of such relation alone. Un-
doubtedly the relation between respondent and his mother
was affectionate and confidential and that he would have a
general influence over his mother proceeding from such re-
lation. But the existence of such relation and this general
influence raises no presumption that undue advantage was
taken of it by respondent. There is no legal suspicion of
undue influence arising from the existence of such a relation-
ship, which imposes upon the son the necessity, when a will in
his favor is attacked, of assuming the burden of proof that
he had not unduly influenced his mother in making her will.
The confidential relation and the opportunity afforded there-
from to exercise undue influence may, of course, always be
taken into consideration with other evidence, when the ques-
tion of undue influence is in issue. But the relation itself, and
opportunity, are not sufficient alone to warrant a finding that
undue influence was actually exerted. Proof, merely, that
confidential relations existed between a testator and the main
beneficiary under his will is not sufficient to destroy its
validity, but there must be some proof, in addition to the
relation of facts or circumstances showing the use of that
relation at the time the will was made overcoming the free
will and desire of the testator, in order to invalidate the testa-
ment."

Appellants call our attention to the admission of certain
testimony regarding the declarations of one residuary legatee
not made in the presence of the other. There were several
instances of this sort of testimony, but it will be sufficient
to refer to a few only. Mrs. Werthman related a conversa-
tion which she said occurred in Oakland in the month of
April following her father's death. She testified that on that

occasion she said to Mrs. Schwalbe, "you made father make that will, you know you did," to which, as she testified, Mrs. Schwalbe replied, "Of course, wouldn't you have done the same thing if you could?" Respondent contends that this evidence went in without objection, but an examination of the record shows that as soon as any conversation with Mrs. Schwalbe was called for in a question to Mrs. Werthman, counsel raised the specific objection that a declaration of one legatee made without the presence of the others was heresay and not binding upon them. All the rest of Mrs. Werthman's testimony went in subject, by stipulation, to the same objection and exception. This was clearly error under the rulings of this court in *Estate of Dolbeer,* 149 Cal. 245, [86 Pac. 695]; *Estate of Dolbeer,* 153 Cal. 662, [96 Pac. 266]. The same error was committed by the court in admitting evidence of Mrs. Schwalbe's boasts that she could "handle" her father and "turn him around in five minutes like a child;" and in allowing certain papers in the probate proceedings to be offered as written admissions of Sarah Schwalbe. In allowing one of these documents to be received in evidence the court said: "It will not be binding against her" (meaning Mrs. Bloom) "but binding against Mrs. Schwalbe." Evidently the court did not have in mind the rule announced in *Estate of Dolbeer,* 149 Cal. 245; *Estate of Freud,* 73 Cal. 556, [15 Pac. 135]; *Estate of Pforr,* 144 Cal. 121, [77 Pac. 825], that a will cannot be invalidated as against one legatee and upheld with respect to others. This misconception led to the erroneous admission of numerous declarations of Mrs. Schwalbe which we need not review with greater particularity.

The court also admitted declarations made before and after the execution of the will tending to show the affection of Lavinburg for his son Leon. Such declarations when there is no issue of unsoundness of mind are properly admitted if limited by the court in suitable instructions to their function of showing friendliness of a testator to one of his heirs, but appellants contend that error was committed by the court in failing to limit their application. We think this contention must be sustained. (See *Estate of Ricks,* 160 Cal. 456, 467, [117 Pac. 532, 539], and cases there cited.)

Appellants also complain of the introduction of evidence by

the contestant revealing the unhappy married life of the testator and his second wife, but it was the theory of the contestant that these marital troubles so worked upon the sensibilities of Lavinburg as to make him an easy prey to the machinations of his daughter Sarah. The evidence did show that he was greatly distressed by the divorce case and the incidents connected with it. If the engagement of respondent to show that Mrs. Schwalbe took advantage of her father's distress had been successfully accomplished, the evidence of the domestic woes of the old man would have been material. The court properly admitted it in support of the theory of the contestant.

Appellants also call our attention to the court's refusal to permit the former wife of the testator to answer certain questions with reference to his mental condition at about the time of the execution of the will. The record shows, however, that she testified upon direct examination regarding her former husband's mental condition as favorably to appellants as they could possibly desire. The court properly sustained an objection to an interrogatory on cross-examination by which her opinion was sought upon the question whether or not Lavinburg was easily influenced. The question was not pertinent to anything about which she had spoken on her direct examination.

Respondent was permitted to introduce evidence regarding his financial condition. If this had been done as a part of his case in chief respondent concedes that it would have been serious error (*Estate of Kaufman,* 117 Cal. 296, [59 Am. St. Rep. 179, 49 Pac. 192]), but proof of his poverty he insists was properly allowed in rebuttal of the showing made by appellants that the testator believed his son Leon to be a wealthy man by reason of certain boastings and exhibitions of ready money. He denied on the witness stand that he had ever made any such pretenses of wealth to his father. This evidence, of course, was properly allowed but as the material inquiry related to the father's belief on the subject of his son's wealth and not to the fact of the latter's wealth or poverty, the principle of the Kaufman case was applicable and the evidence that Leon Lavinburg was really a poor man was improperly allowed.

Certain instructions are criticised by appellants but we

think that these criticisms are for the most part unfounded. Viewed in its entirety the charge to the jury fully and fairly stated the law.

The orders from which appellants prosecute their appeal are reversed.