[Civ. No. 2368. Fourth Appellate District.—June 13, 1940.]

In the Matter of the Estate of KATHERINE HAMPTON, Deceased. HAZEL L. SLIFF, Appellant, v. BERTHA HOUGHTALING et al., Respondents.

Stickney & Stickney, William H. Wylie and Clarence B. Smith for Appellant.

John W. Holler and Sloane & Steiner for Respondents.

GRIFFIN, J.—This appeal is from a judgment and order admitting a will to probate after granting a motion for a nonsuit, and involves a contest between appellant, Hazel L. Sliff, illegitimate child and sole heir at law of Katherine Hampton, deceased, and the respondents, Bertha Houghtaling and Mildred Hartley. One W. A. Bolton was the proponent of one will and the beneficiary of decedent's estate under an instrument alleged to have been executed by the decedent as her last will and testament on March 31, 1938. Respondents were nieces of C. E. Hampton, deceased husband of Katherine Hampton, and beneficiaries under an instrument alleged to have been executed by her on April 6, 1938. Each of these instruments was offered for probate in the present proceedings by the beneficiaries named therein, as Katherine Hampton's last will and testament. She died on April 7, 1938, at San Diego, from a gunshot wound, self inflicted, several hours after she had signed the instrument dated April 6, 1938. At the time of her death she was a widow, her husband C. E. Hampton having died on March 28, 1938, from a paralytic stroke after an extended illness. C. E. Hampton left no children or issue of children. He, under a will made some years prior to his death, bequeathed his entire estate to his wife, Katherine, and at the same time she executed a will wherein she bequeathed her entire estate to him. Katherine Hampton, for several years prior to her death, was afflicted with carcinoma of the stomach, which disease during the last few months of her life had reached a stage where she no longer was physically able to perform her household duties, attend to her financial affairs, or take care of her personal necessities and requirements, and by reason thereof she was compelled to rely upon and to place confidence in anyone who would undertake to provide for her daily needs and to look after and manage her financial affairs. This situation was aggravated by the mental strain and worry

caused by the realization of her husband's critical illness and inevitable early death. It is apparent that during this period Katherine Hampton was surrounded by her husband's brother, C. T. Hampton, Bertha Houghtaling, Mildred Hartley and W. A. Bolton, all eager to do whatsoever each thought was necessary to gain the favor of Katherine. Hazel Sliff, appellant, a daughter of Katherine Hampton, deceased, was born at a time when Katherine Hampton was 17 years old and unmarried. When appellant was approximately three months old, her mother placed her with a family residing in Kansas, and after paying for the care and support of her baby for several months Katherine left the community and sought her livelihood elsewhere. After a few years of moving from place to place she ultimately arrived at San Diego, where she married and thereafter maintained a residence for many years prior to her death. Katherine, for reasons of her own, kept within her own bosom the fact that she had a daughter, and as far as the record discloses never made any effort to ascertain the whereabouts of appellant, or whether appellant was living or dead.

W. A. Bolton was no relation to decedent, but according to his testimony was an advisor of Katherine Hampton of long standing. Bolton, at the time he obtained the signature of Katherine Hampton upon the instrument dated March 31, 1938, also obtained from her a deed to two parcels of real property, one known as the Fourth Street property and the other as the Fifth Street property, owned by Katherine Hampton, situated in San Diego and of the approximate value of $25,000, which deed conveyed the real property to W. A. Bolton, reserving a life interest therein to Katherine Hampton. Bertha Houghtaling is a daughter of C. T. Hampton, a brother of decedent's husband. Mildred Hartley is a daughter of a sister of decedent's husband. C. E. Hampton at the time of his death, left him surviving four brothers and three sisters. All, except C. T. Hampton, resided outside of California. Bertha Houghtaling, prior to November, 1937, resided with her husband and family in Idaho, and had met Katherine Hampton for the first time in June, 1937, while in San Diego on a visit to her father. The physical condition of both C. E. Hampton and Katherine Hampton during November, 1937, became so serious that it was apparent that both must inevitably die within a very short

time. Which one would go first was a problem which time alone could solve. In November, 1937, Bertha returned to San Diego and was a constant visitor at the Hampton home until January, 1938, when she remained continually with the Hamptons until Katherine Hampton's death.

It is argued that Bertha and Mildred's entrance into the Hampton home was prompted by a pecuniary interest in the estate of their uncle and later in the estate of his widow, which estate was about to pass to the next of kin of the survivor of them or to whomsoever might succeed in having himself or herself made the beneficiary of the survivor in his or her will. Mildred, on February 1, 1938, "heard that her uncle was so sick" that on the next day she left her husband and family to come to San Diego to make herself helpful in the Hampton home. She continued to remain in the household and to perform the duties of nurse until after the death of Katherine Hampton.

The evidence discloses that during this period Bertha and Mildred were continuously present in the Hampton household and rendered rather arduous services for the two individuals, and they were paid a small remuneration for their services. The decedent, on March 3, 1938, "authorized Bertha Houghtaling's signature to her bank account" and "thereafter Bertha Houghtaling made deposits in her bank account and when Katherine Hampton received checks . . . Bertha Houghtaling would endorse them and deposit them in the bank". During this period Katherine Hampton was dependent "almost entirely" upon Bertha and Mildred for comfort and the necessities of life. She could not prepare the necessary food and she needed attention at night.

W. A. Bolton, a stranger to Bertha and Mildred, shortly before the death of C. E. Hampton, unsuccessfully undertook to have Hampton execute a codicil to his will. On March 28, 1938, C. E. Hampton died and Katherine became the owner of her husband's estate. On the day of the funeral, March 30th, Bolton went to the home of Katherine Hampton and discussed with her in private the matter of the disposition of her property. According to his testimony, he told Katherine that "the nice thing to do would be to arrange it so that C. T. Hampton" would receive a full release from an indebtedness of $1500 that he owed C. E. Hampton, and "that she ought to give Bertha Houghtaling at least $500

out of something''. After discussing the provisions that should be made for the Hamptons, the disposal of the real properties owned by Katherine Hampton was considered, and according to Bolton, Katherine made the following statement: ''Now Bolton, I don't want my relatives to have anything, they have already taken from me and given me nothing and I just want to give them five dollars apiece;'' that she then suggested that if he (Bolton) wanted the Fifth Street property and the Fourth Street property he could have them. Bolton testified that after taking notes as to the request and immediately after leaving the Hampton home on this occasion, he saw an attorney at the request of Mrs. Hampton and asked him to prepare a will for her from instructions given to him and to prepare a deed whereby Katherine Hampton would convey to Bolton the real property ''on lower Fifth Street'' and the ''Fourth Street property''. Bolton returned to the Hampton home the next day when respondents, Bertha and Mildred, were there, accompanied by an attorney other than the one drawing the will and deeds, together with the attorney's secretary who was a witness to the execution of the instrument. This attorney and the witness were conducted to the sick room by Bolton who, after making the proper introductions, went downstairs to wait for the deed and the will after both were signed by Katherine Hampton. Bolton left the Hampton home with the will and deed. Bertha and Mildred, a few days later, discovered that Bolton had procured from Katherine Hampton a will and a conveyance from her to himself of the Fourth and Fifth Street properties above mentioned. About midnight on April 4th, Bertha, Mildred and the decedent had a conversation in which Mrs. Hampton said ''she had been double-crossed, that she didn't know that she had signed a will of that kind and she didn't know the Fourth Street property was in that deed''; she ''talked about sending an attorney up there'', meaning to Bolton's home. Bertha, in the early morning of April 5th, went to her father's home in San Diego and told him that Bolton had a will and the deed and that Mrs. Hampton wanted an attorney and that she, Bertha, ''didn't know what Katherine Hampton was going to do except she said she wanted Mildred and I to have the Fourth Street property''; that she didn't know anything about her making out a will.

C. T. Hampton came to the Hampton home with one John Holler, an attorney, whose father was known to Hampton many years ago, at about .6 o'clock in the evening of April 5th, introduced him to Katherine Hampton, and remained in the room during the time that the attorney was present. The attorney on this occasion conversed with decedent and then dictated to Bertha a form of deed conveying the "Fourth Street property" to Bertha and Mildred, which deed was typewritten by Bertha. The attorney, while this deed was being written, prepared a will in his own handwriting, which instrument was signed by decedent in the presence of Bertha and C. T. Hampton before the attorney left. The deed was presented to decedent for signature which she then executed. During that evening, at the direction and request of the decedent Katherine Hampton, C. T. Hampton, Bertha Houghtaling and the attorney went to the home of Bolton, where the attorney demanded a reconveyance of the Fourth Street property to Katherine Hampton, which reconveyance Bolton refused to make. The attorney prepared a typewritten will to the same effect as the handwritten one, which he presented to decedent for signature the next day. All of the wills except the one written in the handwriting of the attorney, contained a provision that the deceased purposely made no provision for any other person, whether claiming to be an heir of hers or not, and if any person, whether a beneficiary under the will or not mentioned therein, should contest the will or object to any of the provisions thereof, he should receive $1.

On April 11, 1938, Bertha Houghtaling filed her petition for probate of the instrument of April 6, 1938, as the last will and testament of Katherine Hampton, deceased. On the same date, Bertha Houghtaling, as special administratrix, filed suit against W. A. Bolton to cancel the deed to him dated March 31, 1938, on the grounds of fraud, unsound mind, and undue influence. April 20th Bolton filed his petition for probate of the instrument of March 31, 1938. On the same day he filed his opposition to the probate of the instrument of April 6th offered by Bertha Houghtaling, alleging undue influence, fraud, etc. May 4th Bertha filed her opposition to the probate of the instrument of March 31, 1938. June 20, 1938, attorneys for Bertha Houghtaling, as special administratrix filed a petition for authority to com-

promise the suit filed against Bolton by dividing the properties described in the deed and will between Bolton and the estate. The contemplated division is hereinafter more fully set forth.

Through some advertising medium Hazel L. Sliff, daughter of Katherine Hampton, was located in the East and on November 2d, 1938, she filed her petition for letters of administration and also filed opposition to probate of both wills, alleging generally in count one, that the instruments offered for probate had not been executed in the manner or form provided by law for the execution of wills; in count two, that the decedent at the time of the execution of each of the two instruments, was of unsound mind and memory and did not possess testamentary capacity to make a valid will; in count three, that each of the instruments was signed by Katherine Hampton while acting under undue influence and fraud of W. A. Bolton, Bertha Houghtaling, Mildred Hartley and others.

These allegations were in general denied by the proponents of the respective wills. The trial judge, at the commencement of the trial, limited the issues to that of whether the instrument offered for probate by Bertha Houghtaling, wherein she and Mildred Hartley were sole beneficiaries, was the last will of Katherine Hampton, deceased. Appellant introduced evidence in support of her opposition to the probate of said instrument and, after appellant closed her case, proponents moved for a nonsuit upon all three grounds of opposition, which motion was granted. Motion for new trial was made and denied. Judgment was duly entered upon the nonsuit, from which judgment this appeal has been taken.

Besides the claim of unsound mind of decedent, it is argued that the record contains substantial evidence sufficient to establish a confidential relationship, and that a *prima facie* showing of the necessary facts was made and that the burden was cast upon respondents to show that the instrument offered for probate by them was not induced by undue influence, citing *Estate of Graves,* 202 Cal. 258 [259 Pac. 935], *Estate of Johnson,* 31 Cal. App. (2d) 251 [87 Pac. (2d) 900], and *Estate of Burns,* 26 Cal. App. (2d) 741, 749 [80 Pac. (2d) 77].

Respondents maintain that there is no evidence of any direct act of undue influence in the record and that the

activities on the part of the proponents as related, were not sufficient to raise a presumption that they exerted undue influence in securing the will, and that in order to raise an inference of undue influence and oblige the beneficiaries to produce proof, it is vitally necessary for the contestant to prove that one or more of the beneficiaries under the will *actively* participated in procuring its execution, and cite *Estate of Burns, supra, Estate of Ricks,* 160 Cal. 450 [117 Pac. 532], *Estate of Higgins,* 156 Cal. 257, 261 [104 Pac. 6], *Estate of Lavinburg,* 161 Cal. 536, 543 [119 Pac. 915], and *Estate of McDevitt,* 95 Cal. 17, 33 [30 Pac. 101].

■ Appellant argues that the question here presented is not whether the record contains any substantial evidence tending to prove that the instrument offered for probate was induced by undue influence, but whether the record contains substantial evidence tending to prove the necessary facts as stated in *Estate of Graves, supra.* Although the beneficiaries testified directly that Mr. Holler, the attorney who drew the will, was not employed by, nor did he act as attorney for them at the time of or prior to the execution of the will, and that neither beneficiary discussed with Mrs. Hampton the form or contents of the deed to be made by her, it is to be noted that Mrs. Hampton never knew Mr. Holler prior to the time he entered her room for the purpose of drawing a will and deed in which respondents were the beneficiaries and grantees. The evidence clearly shows that, assuming the truth of the statement that Mrs. Hampton asked to have an attorney sent up to Bolton's home because she had been double-crossed, it is apparent that this request could not be construed as an authorization and direction to secure an attorney to draw a will in which respondents were to be the beneficiaries and also execute a deed to them covering such property as had already been disposed of by a former deed. The only testimony bearing on decedent's desire to have respondents share in the Fourth Street property for "taking care of her" was a claimed statement of decedent's made in the early morning of April 3d or 4th. Attorney Holler, since the filing of the will for probate, admittedly has represented respondents, and although a witness to the will, he never testified in reference to his employment or the condition of decedent's mind at the time of the execution of the will. Likewise, the other subscribing witness, failed to testify as

to decedent's mental condition. Referring to the deed to respondents and Mr. Holler's position in the matter, Mrs. Houghtaling testified on cross-examination as follows: "Q. Did he (Mr. Holler) hand you this deed after it was signed? A. No, I don't think he did. Q. What was done with it. . . . A. To the best of my knowledge he took it with him. Q. You let him take it as your attorney? A. Yes, sir. Q. You let him take it and copy it as your attorney? A. Yes, sir." It is argued by respondents that this statement was meant to apply to the relationship after April 5th, and although confusing, the record tends to support this argument. However, a conclusion, from all the facts and circumstances, that a confidential relationship existed, receives support under the facts and reasoning expressed in *Estate of Graves, supra.* There it was held that in a will contest, where the affairs of the decedent, the affairs of the person charged with using undue influence in securing the execution of the will, and the affairs of a third person were interrelated, it was proper in the grounds of contest to set out in detail the circumstances under which the one charged with undue influence became the confidant and business advisor of the other two persons, and from the facts the court might determine as a matter of law whether they constituted undue influence.

Although it has been held that confidential relationship alone between a decedent and his descendants, his spouse or his parents is not, of itself, sufficient to cast upon his children, his wife or his parents the burden of showing that the will was not induced by undue influence. (*Estate of Lavinburg, supra, Estate of Donovan,* 114 Cal. App. 228 [299 Pac. 816], and *Estate of Flatau,* 10 Cal. (2d) 701 [76 Pac. (2d) 506]), the respondents in the instant case were not related by blood nor were they heirs at law of deceased, entitled to inherit from her estate. Under such circumstances, in determining the question of confidential relationship, the rule cited in *Estate of Graves, supra,* is particularly applicable, i. e., "the rule is well settled that where one who unduly profits by a will as a beneficiary thereunder sustains a confidential relation to the testator, and has actually participated in procuring the execution of the will, the burden is on him to show that the will was not induced by coercion or fraud and in such a case a presumption of undue influence arises from proof of such facts". It is also stated therein

(from the syllabus): "Three well-established facts, among others, which are recognized as being indicative of undue influence, or a subversion of a decedent's volition, are (1) the relations between the one charged with exercising the undue influence and the decedent, affording the former an opportunity to control the testamentary act; (2) the decedent's condition such as to permit of a subversion of her freedom of will; . . . (3) the former's activity in procuring the instrument to be executed; and (4) the fact that he unduly profited as beneficiary under the will; and while none of these circumstances, standing alone, has the effect of creating a presumption against the validity of the instrument, their probative force, in combination, is to impose upon the proponent the obligation of presenting evidence of volition, and to make the question as to undue influence one of fact for the jury's determination."

◼ Considering the first fact, i. e., of opportunity to control the testamentary act, the evidence discloses that respondents, during the last months of Katherine Hampton's life, were in possession and control of the decedent's home where she was confined to her room, afflicted by a serious and fatal illness, and had sole and entire management of her financial affairs; that at the time the instrument offered for probate was procured from decedent respondents were, at decedent's request, endeavoring to have Bolton reconvey to her (decedent) certain real property that decedent claimed Bolton had her convey to him through fraud. Respondents were nurses who, during the last ten days of her failing life, rendered constant attention to decedent day and night. As to the second fact mentioned, the evidence discloses that Katherine Hampton, as early as March 3, 1938, realized that her condition was such that the time had come when "she might get so she wasn't able to sign checks" and on that day she surrendered control of her bank account and financial affairs to Bertha Houghtaling; that after the death of her husband she became bewildered as to how she should dispose of her estate in the event of her death, and her mental condition was such that she signed instruments at the suggestion of those who were in the home without reading the same or having any knowledge of their contents. Between March 31st and April 6th she signed three different instruments

purporting to be her last will, as well as signing three various deeds conveying her real property. The physical condition of Mrs. Hampton during this period of time was such as to permit of a subversion of her freedom of will. The record clearly indicates that after decedent had executed the will and deeds in favor of Bolton that she claimed she had been "double-crossed" and demanded that Bolton be made to reconvey this property to her. She later claimed that the instrument was not her will; that she did not remember making such a will; and that she never intended to make such a will. On April 5th, while insisting that the Fourth Street property be conveyed back to her, nevertheless she signed another deed to the property conveying the same to Bertha Houghtaling and Mildred Hartley. This deed was typed by Bertha Houghtaling and acknowledged before Mr. Holler, the attorney brought to the Hampton home by C. T. Hampton. The conveyance was without consideration. As to the third fact, the evidence indicates that respondents, as well as Bolton, were all pressing the decedent to execute a will whereby they or some of them might acquire her estate. Their acts and conduct toward the decedent seemingly tended toward the subversion of Mrs. Hampton's freedom of will and to bring about a mental condition whereby they would dominate her will and control her action in the manner and method of distribution of her estate.

The testimony of a Mrs. Scott, a neighbor to deceased, is of interest on the subject. She had known Mrs. Hampton for 13 years and they were the closest of friends. On the morning Mr. Hampton passed away she talked with Mrs. Hampton respecting her property and Mrs. Hampton told her that "she was figuring on giving Mildred the furniture in the house and that she was going to give Bertha a thousand dollars and she said that they owed some money on the Texas property—that is, Mr. Hampton's brother did—and she was going to let them have that. And then she said, 'You folks haven't got a car.' And she said, 'I am planning on giving Scott the car.' And she says: 'To you, Margaret, I am planning on something nice.' She didn't say what."

Neither Mrs. Scott nor her husband were beneficiaries under the will. Respecting a safe in the house, Mrs. Scott testified that Bolton said to her in the presence of Mrs. Hartley at the time the will was made in Bolton's favor, that they were

going to open the safe the next day and "if you were here you could get in on the spoils too". She further related that after Bolton left the house she conversed with Mrs. Hampton and she said "she thought she took care of everything and she said if there was any dissatisfaction they (Hamptons) could fight over it". She further testified that Mrs. Hampton was in great pain that day, nervous and "not a bit contented"; that she remarked about respondents and expressed a desire that they "get out and leave her alone"; that on the day Katherine shot herself she inquired of Bertha as to why she shot herself and Bertha replied "Didn't you know she left everything to Bolton?"; that the respondents never told her about a new will in their favor; that they refused to allow her to go to the hospital to see Katherine shortly before her death but she went anyway; that while there she said to Katherine "Honey, what has happened?" and Katherine said "Margaret, they have been dogging the life out of me"; that she returned to the Hampton home and heard Bertha remark to Mildred "We are safe; and we are getting the Fourth Street property too"; that she was so tickled that she danced up and down and said "Goodie, goodie, goodie".

Incidentally, when respondents filed their petition for probate of the will, instead of setting forth the names of the decedent's heirs, they listed as her only heirs the brothers and sisters of her deceased husband and designated them as brothers and sisters of the deceased. This fact would conceal the names and addresses of her natural heirs, and notice of the probate of the will undoubtedly was not given to her heirs.

As bearing upon the questions involved, it is of interest to note that Bolton in his verified opposition to the probate of the will involved, alleged that decedent was, at the time of making the will, "bedridden, sick, weakened and distressed in body and mind by sickness, worry, and the recent death of her husband; . . . That . . . Bertha Houghtaling and Mildred Hartley, neither of whom is related to decedent, but who are or claim to be nieces of said deceased late husband, moved into the residence of decedent and took possession and control of said residence and of the care, custody and control of decedent, without the request or wish of said decedent who, in her distressed and weakened condi-

tion, was unable to withstand or avoid the domination and control by said two persons of her person and property.''

Subsequently, after making the compromise agreement, and when called as a witness, Bolton's testimony was as follows: ''And was what you said true in your opposition to that will? A. I certainly thought it was at the time. Q. Do you think so now? A. No. From what came up since, I have not been able to prove that she was not in her right mind; I thought she was not in her right mind when she shot herself or the day of this shooting. That was the impression I had at that time.''

As to the last question, whether or not proponents unduly profited as beneficiaries under the will, it should be noted that they received practically the whole estate appraised at about $20,000. Bertha Houghtaling, a stranger to the blood, whose acquaintance with decedent covers a period of about four months prior to her death, was during that time, nurse and housekeeper. Mildred Hartley, also a stranger, whose acquaintance covered about two months at the time she joined Bertha Houghtaling, likewise helped in nursing and keeping house for decedent. Neither of the proponents was the ''natural object of decedent's bounty'' (*Estate of Lances*, 216 Cal. 397 [14 Pac. (2d) 768] ; *Estate of Nolan*, 25 Cal. App. (2d) 738 [78 Pac. (2d) 456]), nor has it been established that either of them has any peculiar or superior claim to the decedent's bounty.

Respondents have proposed, by their petition, to compromise and to settle the contest with Bolton, to the detriment of contestant, for the consideration of a trust deed in the sum of $2,200 in favor of Bolton on the Fourth Street property, in addition to allowing him to retain title to the Fifth Street property and the automobile. The rule stated in 26 California Jurisprudence, page 655, section 25, is particularly applicable to the facts in the instant case:

''If the provisions of the propounded instrument vary radically from testamentary intentions which the decedent entertained previously to the execution of the writing, this fact, when unexplained, is one of the recognized *indicia* of imposition or undue influence. In conjunction with other facts the circumstance in question creates in favor of the contestant a presumption which requires a submission of the

case to the jury, and which justifies a denial of probate when unrebutted by evidence of the proponent.''

And at page 650, section 21, in reference to confidential relations, it is said:

''One of the recognized *indicia* of undue influence of a subversion of the decedent's volition is to be found in the circumstance that the alleged wrongdoer was in such relations with the deceased as to be enabled to control the testamentary act. In combination with other facts this circumstance creates a presumption in favor of the contestant, and entitles him to have the issue of undue influence submitted to the jury.''

Accepting the evidence in the light most favorable to contestant, which the court is impelled to do under settled and established principles, we are firmly convinced that the foregoing excerpt from the evidence constitutes a *prima facie* showing sufficient to cast the burden upon the respondents to show that the execution of the instrument offered for probate was not induced by undue influence; that the cause, as to the last two counts, was one for the jury to decide. It is therefore apparent that the motion for nonsuit should not have been granted. The attempted appeal from the order denying the motion for new trial is dismissed.

Judgment reversed. Appellant to recover costs on appeal.

Barnard, P. J., and Marks, J., concurred.

A petition by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 12, 1940.