[Civ. No. 4568. Fourth Dist. Aug. 3, 1953.]

Estate of ARTHUR W. OSTRANDER, Deceased. HERMAN J. LAMBRECHS et al., Appellants, v. LOUISE MAY OSTRANDER, Respondent.

James B. Abbey, Charles E. Karpinski and David H. Thompson for Appellants.

Herney & Herney and Marie M. Herney for Respondent.

BARNARD, P. J.—This is an appeal from a judgment denying probate to a will. Arthur Ostrander, aged 78, died September 5, 1951, leaving as his sole heir at law an unmarried daughter, Louise, who was 43 years of age. His estate consisted of $6,954 in a savings account, an old automobile and a "ranch" worth some $2,000. On June 25, 1951, he executed a will, leaving $100 to his daughter and everything else to Mr. and Mrs. Lambrechs. He had made a prior will leaving everything to his daughter. Mr. Lambrechs was the brother of the testator's deceased wife. The new will was

filed for probate and the daughter filed this contest. A jury specifically found that Mr. Ostrander was not of sound mind when he executed the will, and that he executed it by reason of the undue influence of the proponents. A motion for a new trial was denied and the Lambrechs have appealed from the judgment.

The testator's wife, who had operated a fur store, died in 1943. After her death he sold the store, investing most of the proceeds in government bonds in the joint names of himself and his daughter. From 1925 to 1943, the daughter had done the housework to enable her mother to operate the store. She continued to keep house for her father until 1946, when he sold his home and moved to the "ranch" some 30 miles from San Diego. The daughter then moved into a small apartment and supported herself by doing ironing and caring for children. From 1946 to 1951, she went to the "ranch" on weekends and holidays, where she cooked, cleaned, washed and did other work for her father.

Early in March, 1951, the decedent locked himself in his house on the "ranch" for four or five days. A deputy sheriff who was called found him in bed fully clothed and with four loaded guns. He was incoherent in speech, did not recognize his friends, and said he was going to use the guns on anyone that came around and bothered him. The deputy sheriff advised the daughter to file a psychopathic complaint against him. Instead of doing so, she took him to her apartment where he remained until March 8th. He was then taken to a hospital where he remained a week, and then to a sanitarium licensed to care for senile mental patients, where he remained a month. The daughter then arranged to have him cared for in the home of his nephew, Clyde Ostrander, where he stayed from April 15th to June 19th. He then went to the home of an old friend and stayed until June 23d, when he went to the home of the Lambrechs and stayed there until he died. His daughter had visited him regularly while he was in the hospital, the sanitarium, and at his nephew's. While at the nephew's, he wanted to make a will leaving his property to the nephew, and he wanted to make a will leaving everything to this friend during the three days he was there.

On June 9th and June 19th, the testator drew all of his funds from two bank accounts, a total of about $1,800. He also took all his bonds from his safety deposit box. These bonds were all in the joint names of himself and his daughter, except one which had been issued to the testator and his wife. The last

one of the bonds had been purchased in March, 1951. Shortly after the testator arrived at the Lambrechs' home on June 23d, he showed Mrs. Lambrechs some money ''in rolls'' and these bonds. She told him he should not carry them around with him. On the morning of June 25th, she helped him make a list of these bonds. Mrs. Lambrechs testified that on that morning the testator asked her to locate a Mrs. Aust, who had been a friend of his wife, and that she then called Mrs. Aust and made an appointment to meet her that afternoon. Mrs. Aust was a secretary in the office of an attorney who had represented Mr. and Mrs. Lambrechs for some 10 years.

In the afternoon of June 25th, Mrs. Lambrechs took the testator downtown as he said he wanted to buy a hat. She took him to the San Diego Trust and Savings Bank, although the testator had for years done his banking business at two other banks, in one of which he still had a safety deposit box. She took him to an officer of the bank and the testator produced his roll of cash and the bonds. The bonds were cashed and the banker suggested that all the money be deposited in a savings account, which was done. During the conversation the banker suggested that the testator ought to make a will.

Mrs. Lambrechs then took the testator to the office of her attorney in the same building, where the will in question was prepared and executed. A woman who had worked for the Lambrechs for many years without compensation, as a ''labor of love,'' was present at the bank and at the lawyer's office, and she and Mrs. Lambrechs remained in the room with the testator while the will was being executed, and during all of the conversation in connection therewith. The attorney had never met the testator before and did not charge him for his services. Mrs. Lambrechs took part in the interview and the testator frequently asked her for information concerning his past life. After the will was executed it was given to the testator who turned it over to Mrs. Lambrechs shortly thereafter, and she retained possession of it until he died. On the night he died she told the daughter that she knew nothing about the terms of the will.

The appellants first contend that the evidence is not sufficient to support the finding of undue influence under the test which is set forth in *Estate of Lingenfelter,* 38 Cal.2d 571 [241 P.2d 990], as follows:

'' '(1) The provisions of the will were unnatural. . . . (2) the dispositions of the will were at variance with the intentions of the decedent, expressed both before and after

its execution; (3) the relations existing between the chief beneficiaries and the decedent afforded to the former an opportunity to control the testamentary act; (4) the decedent's mental and physical condition was such as to permit a subversion of his freedom of will; and (5) the chief beneficiaries under the will were active in procuring the instrument to be executed.' ''

It is conceded that the evidence is sufficient to support the first and second of these requirements. In support of the contention that the appellants were not in a position to control the testamentary act of the testator it is argued that no confidential relationship existed; that the testator came to their home of his own accord only two days before the will was executed; and that three disinterested persons were present when the will was prepared and executed. It is argued that the only evidence which tends to support the requirement that the proponents were active in procuring the execution of the will is the fact that the draftsman of the will had for some years acted as attorney for them, and the fact that one of the proponents was present in the room when the will was executed; and that these facts are overcome by the fact that it was the banker who suggested to the testator that he ought to make a will. It is further argued that there was no evidence that the decedent's mental and physical condition was such as to permit a subversion of his freedom of will, since there was no substantial evidence to support the jury's finding that the testator did not have testamentary capacity.

The evidence was sufficient to show an existing relationship between these parties which afforded an opportunity to the appellants to control the testamentary act, especially in view of the testator's mental condition as shown by the record. They had known the decedent since 1904 and had visited him frequently prior to Mrs. Ostrander's death, and Mr. Lambrechs was his brother-in-law. Mrs. Lambrechs testified that from 1946 until the spring of 1951, the testator came to their house very often; that he consulted her with reference to all his business matters, and she advised him with respect thereto; that he always came to her for advice; that while he was staying in his nephew's home he asked her to find a place for him; and that when he came to their home on June 23d she told him he could stay there as long as he wanted to do so. He showed her the money and bonds the first day and then followed her advice as to what he should do with them, although he had apparently not trusted the banks in which

they had previously been kept. He had moved twice within four days, and had twice before wanted to make a will in favor of the person with whom he was staying although he had been in the last person's home only three days. Whether or not the evidence was legally sufficient to show lack of testamentary capacity on the day the will was executed, there was ample evidence that he had been of unsound mind in a medical sense for many months, and some evidence that he was suffering from a delusion regarding his daughter. The evidence in this connection also had a bearing upon the existing relationship and the opportunity to control the testamentary act.

With respect to the matter of activity on the part of the proponents in securing this will, there is evidence that Mrs. Lambrechs advised the testator concerning his money and bonds on June 23d, and again on the morning of June 25th. She testified that on that morning the testator asked her if she could locate a Mrs. Aust who, he said, used to be a friend of his wife; and that she called Mrs. Aust and made an appointment to meet her in the lawyer's office that afternoon. She knew that Mrs. Aust worked for her attorney but did not tell the testator of this fact. She testified that he had said nothing about making a will or wanting to see a lawyer before they left her home. Having taken him downtown. ostensibly to buy a hat, she took him to the bank where she had done business for years. The banker had never seen the testator before, and did not know that he had a daughter. The banker testified that nothing was said in his presence about the immediate making of a will.

After the bank account was opened, Mrs. Lambrechs took the testator up to the lawyer's office. The attorney who prepared the will testified that before they came to his office Mrs. Lambrechs had called him on the phone and said that there was a Mr. Ostrander there who wanted to come in to see him about making a will; that he could not remember whether or not the phone call had been on that same day; that when they came in he believed Mrs. Lambrechs opened the conversation and told him that Mr. Ostrander wanted to make a will; that Mr. Ostrander then said he wanted a will that nobody could break; and that he called in another lawyer and a secretary from his office, and questioned the testator in their presence in order to have them as witnesses to the testator's mental condition if anybody tried to break the will. The lawyer who was thus called in testified that he was there about

20 minutes and that the lawyer who drew the will was there only part of the time; that Mrs. Aust told the testator that she had been a friend of his wife's for a good many years; that the conversation was chiefly between Mrs. Aust and the testator; that during the conversation the attorney who drew the will asked the testator ''to explain to me the reason for making the will as he did''; and that the only explanation then made by the testator was that he intended to exclude his daughter because of her conduct in a real property transaction which had taken place shortly prior to that time. There is no evidence that the testator had been involved in any real estate transaction since 1946. There is substantial evidence supporting the implied finding with respect to the matter of activity. (*Estate of Abert,* 91 Cal.App.2d 50 [204 P.2d 347]; *Estate of Hampton,* 39 Cal.App.2d 488 [103 P.2d 611]; *Estate of Teel,* 25 Cal.2d 520 [154 P.2d 384]; *Estate of Bucher,* 48 Cal.App.2d 465 [120 P.2d 44].)

The appellants next contend that the evidence was not sufficient to establish mental incompetency on the day the will was executed, or to prove any specific insane delusion which affected the making of the will. While it is unnecessary to decide this question (*Estate of Teel,* 25 Cal.2d 520 [154 P.2d 384]) the evidence, although conflicting, has an important bearing on the matter of undue influence. The proponents produced eight witnesses who saw the testator on that day, whose testimony was favorable to them on the issue of competency. In addition to the proponents, their attorney and his secretary, these witnesses were the banker who saw the testator for some 10 minutes, an intimate friend of the proponents who met the testator casually while they were making the deposit in the bank, the woman who had long worked for the Lambrechs without compensation, and the attorney who was called in for the purpose of observing the testator's mental capacity.

Seven witnesses, who had been close friends and associates of the testator for many years, testified to many facts and incidents which led them to believe that he was of unsound mind. Among these, in the early part of 1951, the decedent imagined that he had planted vegetables which were being stolen from him; he threatened to shoot the thieves and carried a pistol in his car; he made false accusations; he was very forgetful, and would ask the same question over again within two minutes; he would try to pay for purchases two or three times in the same transaction; he did not recognize old friends

and when told who they were would again ask who they were within two minutes; he did not recognize his surroundings or his daughter, and while at his daughter's home thought he was on the "ranch"; while staying in his daughter's home he told one witness he wanted to see Louise as he had not seen her for a long time; he believed that someone was stealing everything he had and wanted to kill someone; and he falsely accused his daughter of passing his window and refusing to come in and see him. One witness, who had known and seen the testator frequently for over 50 years and who saw him at least 12 times in the spring of 1951, testified that the testator would come in and buy gasoline and want to pay for it twice, and would ask the witness "Do I know you?"

The wife of his nephew, where the testator stayed from April 15th to June 19th, testified that during that period he was confused and had no power of recollection; that he could not identify her as the wife of his nephew and repeatedly failed to recognize her son whom he had known since birth; that he was "will conscious," and once fabricated a story that he had seen his lawyer and made a will giving everything to them; that he did not know the extent and character of his property, and did not know where his safety deposit box was located; that on one occasion she went with him to two banks where he insisted he had rented a safety deposit box although the bank records showed none, and although he had a box in another bank; that he lost his money and forgot where he put things, and then insisted that nothing had been lost; that at times he did not remember that he ever lived on the "ranch"; that he imagined he owned the witness' home and furniture and wanted to sell it; that he would fly into violent rages and threaten to choke his daughter, and in five minutes had forgotten the episode; that he wandered away from home and did not know where he was; and that his daughter came to see him frequently but after her visits he would immediately forget that she had been there. A doctor, who had cared for him after the deputy sheriff found him barricaded in his home, testified that the testator suffered from a permanent and progressive mental disease, both senile dementia and arteriosclerosis; and that he was of unsound mind on March 16, 1951, and on the day the will was drawn. This doctor had for four years been the attending physician for six sanitariums, taking care of mental patients.

While there is a conflict in the evidence with respect to the mental capacity of the testator on the day in question, and

while there is evidence he and his daughter had quarreled at times during the years, the evidence as a whole indicates that he was suffering from a delusion with respect to his daughter which affected the making of the will. The evidence as to his mental condition further discloses a situation which would make the best possible opportunity for the use of undue influence, and strongly supports the jury's finding in that regard.

It is next contended that the court erred in sustaining objections to questions asked of certain witnesses. The questions called for conclusions on the part of witnesses, who did not qualify as intimate acquaintances. Neither error nor prejudice appears. It is further contended that the court erred in refusing to allow the proponent husband to testify as to what the testator had said about his daughter in a conversation between a third party and the testator seven or eight years prior to the execution of the will. No error appears in this connection (*Estate* of *Higley,* 64 Cal.App. 664 [222 P. 626] ; *Estate of Sproston,* 4 Cal.2d 717 [52 P.2d 924] ).

The appellants also attack certain instructions. It is first argued that one instruction, in effect, told the jury that an unjust or unnatural will was in itself evidence of the mental capacity of the decedent, and that this comes within the disapproval expressed in *Estate of Nolan,* 25 Cal.App.2d 738 [78 P.2d 456]. This contention is not supported by the record. It is also argued that the court erred in giving instructions relating to the effect of a confidential relationship between persons procuring the execution of a will and the testator. It is not argued that these instructions were not correct statements of the law, but it is contended that no evidence establishing such confidential relationship was here produced. The evidence was sufficient to justify the giving of the instructions.

The judgment is affirmed.

Griffin, J., and Mussell, J., concurred.